Jan 24, 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. –MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## 17-20054-CR-MARTINEZ/GOODMAN

Case No. _____

18 U.S.C. § 1341
18 U.S.C. § 1347
18 U.S.C. § 1031
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

JOHN HOLLAND,

　　　　　　　Defendant.

_____/

## INDICTMENT

The Grand Jury Charges That:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment,

### The Defendant and Relevant Entities

1.　　　Tenet Healthcare Corporation ("Tenet") was a Nevada corporation with its principal executive offices located in Dallas, Texas. Tenet, among other things, owned for-profit hospitals across the United States. Tenet's stock was traded publicly on the New York Stock Exchange. As a public company, Tenet was required, among other things, to make quarterly and annual filings with the United States Securities and Exchange Commission.

2.　　　Tenet divided its hospital operations by geographic region. One such region was the "Southern States Region." During the majority of the time from 2000 to 2013, Tenet's Southern States Region oversaw the operations of Tenet hospitals located in the southeastern

United States, including Tenet hospitals located in Georgia and South Carolina.   Among the hospitals that Tenet owned and operated in the Southern States Region were: (a) Atlanta Medical Center, Inc. ("Atlanta Medical"), located in Atlanta, Georgia; (b) North Fulton Medical Center, Inc., which did business as North Fulton Hospital ("North Fulton") and was located in Roswell, Georgia; (c) Spalding Regional Medical Center, Inc., which did business as Spalding Regional Medical Center ("Spalding") and was located in Griffin, Georgia; and (d) Hilton Head Health System, L.P., which did business as Hilton Head Hospital ("Hilton Head") and was located on Hilton Head Island, South Carolina (collectively, the "Tenet Hospitals").

3.     From approximately 2007 through 2013, Tenet maintained and operated an affiliated billing center located in Boca Raton, Florida.  This billing center assisted in processing, for payment, Medicaid billings for the Tenet Hospitals, among other things.

4.     From at least 2000 through approximately 2006, Defendant **JOHN HOLLAND** was the Chief Executive Officer of North Fulton.  In or around 2006, **HOLLAND** was promoted and became the Senior Vice President of Operations for Tenet's Southern States Region, where he remained until in or around fall 2013.  In that capacity, **HOLLAND** was one of the senior-most executive officers at Tenet and was responsible for overseeing the operations of all Tenet hospitals in the Southern States Region.

5.     Hispanic Medical Management, Inc., was a corporate entity that did business as Clinica de la Mama ("Clinica").  From at least 1999 through in or around September 2010, Clinica held itself out as operating medical clinics that provided prenatal care to predominantly undocumented Hispanic women in Georgia and South Carolina.

6.     In or around September 2010, Clinica's owners and operators divided the clinics

between themselves and created successor companies. The successor companies were called International Clinical Management Services, Inc., which did business as Clinica del Bebe ("Clinica del Bebe"), and Company A, which did business as Clinica de la Mama. For purposes of this Indictment, Clinica, Clinica del Bebe, and Clinica de la Mama will be referred to, collectively, as "Clinica."

### The Medicaid Program Generally

7.     The Georgia and South Carolina Medicaid Programs ("Medicaid") provided benefits to certain low-income individuals and families in Georgia and South Carolina. Medicaid was administered, at the federal level, by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare and Medicaid Services ("CMS"). In Georgia, Medicaid was administered by the Georgia Department of Community Health ("GDCH"). In South Carolina, Medicaid was administered by the South Carolina Department of Health and Human Services ("SCDHHS"). Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

8.     Undocumented aliens were not eligible for regular Medicaid benefits, but were eligible for certain types of Emergency Medical Assistance ("EMA").

9.     The Georgia and South Carolina Medicaid Programs provided EMA payments to hospitals for health care services provided to undocumented aliens if: (a) such services were necessary for the treatment of an "emergency medical condition," including emergency labor and delivery; and (b) the patient met the financial eligibility requirements under the state's Medicaid plan.

10.     The Georgia and South Carolina Medicaid Programs also provided payments

to hospitals for health care services provided to children born to women who qualified for EMA.

**Applicable Billing Rules**

Georgia Medicaid Program

11.     Hospitals in Georgia that were eligible to bill and receive payment from Georgia Medicaid were required to execute "Statements of Participation," commonly referred to as provider agreements. The provider agreements required compliance with all federal and state laws and regulations, including the federal Anti-Kickback Statute. In addition, by signing the Georgia Medicaid provider agreement, hospitals agreed to follow Georgia Medicaid policies and procedures in order to receive reimbursements from the Medicaid Program.

12.     The federal Anti-Kickback Statute, in general terms, criminalized the knowing and willful payment of remuneration, including bribes and kickbacks, to induce another to: (a) refer a patient to a hospital for services that may be paid, in whole or part, by the Medicaid Program; or (b) arrange for a patient to receive a service at a hospital where the service may be paid, in whole or part, by the Medicaid Program. In addition, the Georgia Medicaid Program rules expressly prohibited any offer or payment of remuneration directly, indirectly, overtly, covertly, in cash or in kind, in return for the referral of a Medicaid patient.

13.     The Georgia Medicaid Program rules also required the hospital to comply with all requests for records, information, and documentation made by the Division of Medicaid, its authorized representatives and agents, and the Secretary of HHS, related to services provided under the Medicaid Program, and to make available for on-site audits by the Division of Medicaid or its agents all records related to services for which claims are submitted to Georgia Medicaid.

14.     In Georgia, provider hospitals participating in the Medicaid Program submitted

4

claims for payment for hospital services rendered to Medicaid patients to the GDCH. The claims were either submitted directly or through a State designee.

15. The Georgia Medicaid Program, through the GDCH, would not pay claims submitted by a provider hospital for patient services that it knew were the result of a violation of the federal Anti-Kickback Statute or which were based on the offer or payment of remuneration directly, indirectly, overtly, covertly, in cash or in kind, in return for the referring a Medicaid patient to that provider hospital.

South Carolina Medicaid Program

16. Hospitals in South Carolina that were eligible to bill and receive payment from South Carolina Medicaid were required to execute contracts with the SCDHHS, commonly referred to as provider agreements. The provider agreements mandated compliance with all federal and state laws and regulations, including the federal Anti-Kickback Statute.

17. By signing the South Carolina Medicaid provider agreement, hospitals also agreed to retain documents and records relating to the delivery of care and services under the provider agreement, and further agreed to permit the SCDHHS and its designees the right to examine such documents and records, to conduct interviews of the hospital's employees, and to conduct on-site reviews of all matters relating to service delivery.

18. In South Carolina, provider hospitals participating in the Medicaid Program submitted claims for payment for hospital services rendered to Medicaid patients to the SCDHHS.

19. The South Carolina Medicaid Program, through the SCDHHS, would not pay claims submitted by a provider hospital for patient services that it knew were the result of a violation of the federal Anti-Kickback Statute.

## Medicare Disproportionate Share Payments

20.     The Medicare Program ("Medicare") was a Federal health care program providing benefits to persons who were 65 or over or disabled.  Medicare was administered by HHS through its agency, CMS and its contractors.  Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

21.     Medicare Part A covered inpatient hospital services, among other things.  Hospital providers participating in Medicare that treated large numbers of low-income patients were able to seek additional federal funds through the Medicare Disproportionate Share ("DSH") program.

22.     To participate in Medicare, hospitals were required to first sign an enrollment agreement in which they certified that they understood that the payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with the federal Anti-Kickback Statute.

23.     As a further prerequisite to payment by Medicare and obtaining DSH funds, CMS required provider hospitals to submit a hospital cost report annually.  A cost report provides, among other things, information about the costs incurred by provider hospitals to treat patients.  Medicare relied upon hospital cost reports to determine, among other things, whether a given hospital was entitled to more reimbursement than it already had received from Medicare.

24.     In determining how much reimbursement a hospital was due based on its yearly cost report, Medicare took into account whether the hospital had served a "disproportionate share" of low income patients.  Generally, the more low-income (including Medicaid) patients treated by a hospital, the greater the amount paid to the hospital pursuant to the Medicare DSH provisions.

25.     The hospital cost report contained a warning that "if services identified in this report

6

were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines, and/or imprisonment may result." The hospital's authorized representative was required to execute a certification which stated, in pertinent part, that "the services identified in the cost report were provided in compliance with the laws and regulations regarding the provision of the health care services," which included compliance with the federal Anti-Kickback Statute.

### Tenet's Corporate Integrity Agreement with HHS-OIG

26.     In 2006, Tenet entered into a civil settlement agreement with the United States. HHS' Office of Inspector General ("HHS-OIG") agreed not to exclude Tenet from participating in Federal health care programs for the conduct covered by this settlement agreement conditioned on, among other things, Tenet entering into a Corporate Integrity Agreement ("CIA") with HHS-OIG and complying with its obligations for a period of five years.

27.     The purpose of the CIA was to ensure that Tenet complied with Federal health care program requirements, including the federal Anti-Kickback Statute.

28.     The CIA required Tenet to, among other things, strengthen its policies and procedures to ensure that each existing or new or renewed "Arrangement" did not violate the federal Anti-Kickback Statute.  The CIA defined "Arrangement" to include every arrangement or transaction involving the offer or payment of anything of value between Tenet and any actual or potential source of health care business or referrals to Tenet.

29.     The CIA also required certain persons who were involved in the negotiation, preparation, review or approval of Arrangements, including Tenet regional executives and hospital executives, to attend "Arrangements Training" each year.  These trainings covered topics that

included the federal Anti-Kickback Statute and compliance with Tenet's policies and procedures relating to Arrangements.

30.     The CIA also required Tenet to report "Reportable Events" to HHS-OIG. A "Reportable Event" was defined by the CIA to mean anything that involved "a matter that a reasonable person would consider a probable violation of criminal, civil or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized."

31.     The CIA gave HHS-OIG and its authorized representatives the right to examine or request copies of Tenet's books, records, and other documents and supporting materials, and to conduct on-site reviews of any of Tenet's locations for the purpose of verifying and evaluating Tenet's compliance with: (a) the terms of the CIA; and (b) Federal health care program requirements. These rights were in addition to the inspection, audit and review rights that HHS-OIG had under law, regulation or contract.

32.     Tenet was required to fully and timely comply with all of its obligations under the CIA. HHS-OIG had the authority, subject to certain review rights, to exclude Tenet for a material breach of the CIA, which was defined to include: (a) a failure by Tenet to report a "Reportable Event"; and (b) a repeated or flagrant violation of the obligations under the CIA. If HHS-OIG excluded Tenet, Federal health care programs were prohibited from paying Tenet for any items or services furnished, provided, or prescribed by Tenet.

33.     The CIA required Tenet to submit certifications from its "Senior Corporate Management" to HHS-OIG as part of its CIA annual reports for each year of the five-year CIA. Tenet "Senior Corporate Management" had to certify that "[t]o the best of my knowledge, except as otherwise described in the applicable report, Tenet is in compliance with the requirements of the Federal health care program requirements and the obligations of this CIA."

8

34.     In connection with Tenet's submission of its annual reports and certifications to HHS-OIG under the CIA, Tenet established a procedure whereby Tenet regional executives, hospital executives and others were required to certify that they had accurately and honestly completed quarterly certifications that required them to disclose, among other things, "Reportable Events" to Tenet.  These certifications were relied upon by Senior Corporate Management, the Chief Compliance Officer, and Regional Compliance Officers to certify to HHS-OIG that Tenet was in compliance with Federal health care program requirements and the obligations under the CIA.

35.     Each year from 2007 to 2012, **JOHN HOLLAND,** in his capacity as Senior Vice President of Tenet's Southern States Region, executed a certification directly to HHS-OIG that Tenet submitted to HHS-OIG as part of Tenet's yearly annual reports under the CIA.

36.     HHS-OIG relied on the certifications of Tenet's Senior Corporate Management, including **JOHN HOLLAND's** certifications, Tenet's Chief Compliance Officer, Tenet's Regional Compliance Officers, and the contents of Tenet's annual reports, among other things, to determine whether Tenet was in compliance with Federal health care program requirements and the obligations of the CIA.

### COUNT 1
### Mail Fraud
### (18 U.S.C. § 1341)

1.     Paragraphs 1 through 36 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around 2000, through in or around 2013, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

**JOHN HOLLAND,**

9

did knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly deliver or cause to be delivered certain mail matter by private or commercial interstate carrier according to the directions thereon.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme for the defendant **JOHN HOLLAND** and his co-conspirators to unlawfully enrich themselves, Tenet, and the Tenet Hospitals by, among other things: (a) paying bribes and kickbacks in return for the referral of patients to the Tenet Hospitals; and (b) falsely and fraudulently representing to HHS-OIG that Tenet was in compliance with its CIA when, in fact, Tenet was not in compliance with its CIA.

### The Scheme and Artifice

The manner and means by which the defendant **JOHN HOLLAND** and his co-conspirators sought to accomplish the purpose of the scheme and artifice included, among other things, the following:

4.      From in or around 2000, and continuing until in or around 2013, **JOHN HOLLAND** and his co-conspirators caused Tenet to pay over $12 million in bribes and other unlawful inducements (including loans and the provision of free services) to Clinica's owners and operators to induce them to: (a) refer Clinica patients (the "Clinica patients") to the Tenet Hospitals; and (b) arrange for services to be provided to Clinica patients and their newborns at the Tenet Hospitals, so that the Tenet Hospitals could bill and receive payment from the Georgia and

South Carolina Medicaid Programs and the Medicare DSH Program for services provided to the Clinica patients and their newborns.

5.      To justify the outlay of significant monies to Clinica and to conceal the true nature and extent of the Tenet Hospitals' unlawful relationship with Clinica, **JOHN HOLLAND** and his co-conspirators created and caused to be created pretextual contracts between the Tenet Hospitals and Clinica. Under these pretextual contracts, the Tenet Hospitals purported to pay Clinica to provide various purported services to the Tenet Hospitals, including management services, marketing consulting services, translation services, translation management services, Medicaid eligibility determination paperwork, community outreach, educational classes, and birth certificate services.

6.      In most instances, the alleged services that were purported to be provided by Clinica, an alleged outside contractor, to the Tenet Hospitals pursuant to these contracts were: (1) not needed and justifiable; (2) duplicative of services already being provided; (3) substandard or problematic; (4) not rendered at all; or (5) rendered by persons who were not qualified to perform them.

7.      To facilitate the payment of bribes and unlawful remuneration to Clinica, **JOHN HOLLAND** and his co-conspirators circumvented Tenet's system of internal accounting controls and the policies, procedures and controls required under Tenet's CIA, by authorizing or causing Tenet to disburse payments to Clinica: (a) without valid contracts in place; (b) without supporting documentation or with inadequate documentation; (c) without the proper review and approval; and (d) with the purpose of inducing Clinica to refer the Clinica patients to the Tenet Hospitals and to arrange for services to be provided to the Clinica patients at the Tenet Hospitals, all in violation of then-existing company policies, procedures, and internal controls.

8.    During the scheme, **JOHN HOLLAND** and his co-conspirators tracked and caused others to track Clinica referrals, admissions, deliveries, and business in a variety of ways, including, at various times, in hard-copy logs, monthly e-mails, monthly spreadsheets, operations reports, business projections, and pro formas, which analyzed past and projected revenues resulting from Clinica referrals and business, among other methods.

9.    At various times during the scheme, **JOHN HOLLAND** and his co-conspirators discussed and analyzed the patient volume generated through the Clinica relationship in company e-mails and in meetings with the owners and operators of Clinica.

10.    To further conceal the true nature and extent of the Tenet Hospitals' unlawful relationship with Clinica from Georgia Medicaid, South Carolina Medicaid, Medicare, and HHS-OIG, and to facilitate the payment of bribes and unlawful remuneration to Clinica, **JOHN HOLLAND** and his co-conspirators falsified Tenet's books, records, and reports and made and caused to be made materially false, fraudulent and misleading representations and omissions to the government.  For example:

a.    **JOHN HOLLAND** and his co-conspirators made and caused to be made materially false, fraudulent, and misleading representations and omissions in internal Tenet memos and supporting documentation regarding proposed business relationships with Clinica;

b.    **JOHN HOLLAND** and his co-conspirators approved, and caused to be approved, and executed, and caused to be executed, contracts between the Tenet Hospitals and Clinica knowing that various contracts contained materially false, fraudulent, and misleading representations and omissions;

c.      **JOHN HOLLAND** and his co-conspirators caused the Tenet Hospitals to submit cost reports that contained materially false, fraudulent, and misleading representations and omissions;

d.      **JOHN HOLLAND** and his co-conspirators, in connection with the preparation of Tenet's filing of its quarterly and annual reports with the United States Securities and Exchange Commission, made and caused to be made materially false, fraudulent, and misleading representations and omissions in Tenet's books, records, and reports; and

e.      **JOHN HOLLAND**, in connection with Tenet's submission of its annual reports to HHS-OIG under the CIA each year from 2007-2012, made materially false, fraudulent, and misleading representations and omissions to HHS-OIG.

11.      To ensure that Clinica patients delivered their newborns at the Tenet Hospitals, and as part of the scheme to defraud as devised, executed, and implemented by **JOHN HOLLAND** and his co-conspirators, the owners and operators of Clinica and others made and caused to be made false statements and representations to Clinica patients. For example, in some instances, expectant mothers were told that Medicaid would only cover the costs associated with their delivery and the care of their newborn baby if the expectant mother delivered at one of the Tenet Hospitals. In other instances, expectant mothers simply were told that they were required to deliver their baby at one of the Tenet Hospitals, leaving expectant mothers with the false and mistaken belief that they could not select the hospital of their choice. As a result of these false and misleading statements and representations, along with others, many expectant mothers traveled long distances from their homes to deliver at the Tenet Hospitals, placing their health and safety, and that of their newborn babies, at risk.

13

12.     As a result of the fraud scheme, Tenet Hospitals fraudulently billed at least $400 million, and fraudulently received at least $127 million, from the Georgia and South Carolina Medicaid Programs for services related to the Clinica patients and their newborns.

13.     As a result of the fraud scheme, Atlanta Medical and North Fulton fraudulently received more than $22 million in Medicare DSH payments related to the Clinica patients and their newborns.

14.     As a result of the fraud scheme, and from 2007 through 2011, Tenet received over $10 billion in payments from Federal health care programs – monies that Tenet would not have had the company been excluded from participation in Federal health care programs.

### Use of the Mails

15.     The defendant **JOHN HOLLAND**, knowingly and with the intent to defraud, devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, for the purpose of executing the scheme and artifice and attempting to do so, did knowingly deliver and cause to be delivered certain mail matter by private and commercial interstate carrier according to the directions thereon, that is, a Federal Express parcel was sent from Dallas, Texas, and delivered on or about January 26, 2012, to HHS-OIG in Miami Lakes, Florida, containing Tenet's Annual Report for the Fifth Reporting Period, which contained materially false, fraudulent, and misleading statements and omissions.

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT 2
## Health Care Fraud
## (18 U.S.C. § 1347)

1.      Paragraphs 1-36 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From in or around 2000, through in or around 2013, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

**JOHN HOLLAND,**

acting with others, knowingly, willfully, and with the intent to defraud, executed and attempted to execute a scheme and artifice to obtain, by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, any of the money and property owned by, and under the custody and control of, any health care benefit program, that is Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items, and services.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme for the defendant **JOHN HOLLAND** and his co-conspirators to unlawfully enrich themselves, Tenet, and the Tenet Hospitals by, among other things: (a) paying bribes and kickbacks in return for the referral of patients to the Tenet Hospitals; and (b) falsely and fraudulently representing to HHS-OIG that Tenet was in compliance with its CIA when, in fact, Tenet was not in compliance with its CIA.

### The Scheme and Artifice

4.      The allegations contained in paragraphs 4 through 14 of the Scheme and Artifice section of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

15

**Act in Execution or Attempted Execution of the Scheme and Artifice**

5.      On or about January 26, 2012, in Miami-Dade, Broward, and Palm Beach

Counties, in the Southern District of Florida, and elsewhere, the defendant,

**JOHN HOLLAND,**

in connection with the delivery of and payment for health care benefits, items, and services, did

knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice

to defraud a health care benefit program affecting commerce, as defined by Title 18, United States

Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false

and fraudulent pretenses, representations, and promises, money and property owned by, and under

the custody and control of, said health care benefit programs, in connection with the delivery of

and payment for health care benefits, items, and services, that is, on or about January 26, 2012, the

defendant **JOHN HOLLAND** caused HHS-OIG to receive Tenet's Annual Report for the Fifth

Reporting Period, that contained materially false, fraudulent, and misleading statements and

omissions.

In violation of Title 18, United States Code, Sections 1347(a)(2) and 2.

**COUNTS 3 - 4**
**Major Fraud Against the United States**
**(18 U.S.C. § 1031)**

1.      Paragraphs 1-36 of the General Allegations section of this Indictment are realleged

and incorporated by reference as though fully set forth herein.

2.      From in or around 2000, through in or around 2013, in Miami-Dade, Broward, and

Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

**JOHN HOLLAND,**

16

acting with others, knowingly and willfully executed, and attempted to execute, a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, in a form of Federal assistance, the value of such form of Federal assistance, and any constituent part thereof, being $1,000,000 or more.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme for the defendant **JOHN HOLLAND** and his co-conspirators to unlawfully enrich themselves, Tenet, and the Tenet Hospitals, by among other things: (a) paying bribes and kickbacks in return for the referral of patients to the Tenet Hospitals; and (b) falsely and fraudulently representing to HHS-OIG that Tenet was in compliance with its CIA when, in fact, Tenet was not in compliance with its CIA.

### The Scheme and Artifice

4.      The allegations contained in paragraphs 4 through 14 of the Scheme and Artifice section of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### Acts in Execution or Attempted Execution of the Scheme and Artifice

5.      On or about the dates set forth below, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant **JOHN HOLLAND**, knowingly and willfully executed, and attempted to execute, a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, in a form of Federal assistance, the value of

such form of Federal assistance, and any constituent part thereof, being $1,000,000 or more, through the following execution of the scheme and artifice:

| Count | Approximate Date Materials Received by Federal Government | Description of Act in Execution or Attempted Execution |
|---|---|---|
| 3 | January 27, 2010 | Tenet's Annual Report to HHS-OIG for the Third Reporting Period |
| 4 | January 27, 2011 | Tenet's Annual Report to HHS-OIG for the Fourth Reporting Period |

In violation of Title 18, United States Code, Sections 1031 and 2.

## FORFEITURE
### (18 U.S.C. § 982(a)(7))

1.    The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **JOHN HOLLAND**, has an interest.

2.    Upon conviction of a Federal health care offense, as defined in 18 U.S.C. § 24 and alleged in Counts 1 and 2 of the Indictment, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.    The property subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(7) includes, but is not limited to, a sum of money equal in value to any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses alleged in Counts 1 and 2 of this Indictment, which may be sought as a forfeiture money judgment against the defendant.

4.    If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with a third party;

    (c)    has been placed beyond the jurisdiction of the Court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be subdivided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p). The property subject to forfeiture pursuant to Title 21, United States Code, Section 853(p) includes, but is not limited to:

(i)      Real property located at 3610 Edgewater Drive, Dallas, Texas 75205; and

(ii)     Real property located at 226 Norfolk Avenue, Park City, Utah 84060.

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

_____
ANDREW WEISSMANN, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
JOSEPH BEEMSTERBOER
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
SALLY B. MOLLOY
ROBERT A. ZINK
  ASSISTANT CHIEFS
ANTONIO M. POZOS
  TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

20

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

CASE NO. _____

vs.

**CERTIFICATE OF TRIAL ATTORNEY\***

JOHN HOLLAND,

_____ Defendant. _____ /

**Superseding Case Information:**

**Court Division:** (Select One)

| | | | |
|---|---|---|---|
| __X__ | Miami | _____ | Key West |
| _____ | FTL | _____ | WPB | FTP |

New Defendant(s)              Yes _____   No _____
Number of New Defendants       _____
Total number of counts          _____

I do hereby certify that:

1.    I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.    I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.    Interpreter:      (Yes or No)      __Yes__
      List language and/or dialect      __Spanish_____

4.    This case will take   __20__   days for the parties to try.

5.    Please check appropriate category and type of offense listed below:

      (Check one only)                              (Check only one)

| I | 0 to 5 days | _____ | | Petty | _____ |
|---|---|---|---|---|---|
| II | 6 to 10 days | _____ | | Minor | _____ |
| II | 11 to 20 days | __X__ | | Misdem. | _____ |
| IV | 21 to 60 days | _____ | | Felony | __X__ |
| V: | 61 days and over | _____ | | | |

6.    Has this case been previously filed in this District Court?      (Yes or No)      __No__
If yes:
Judge: _____      Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?      (Yes or No)      __No__
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____      District of _____

Is this a potential death penalty case? (Yes or No)      __No__

7.    Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?      _____ Yes      __X__ No

8.    Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?      _____ Yes      __X__ No

_____
ROBERT ZINK
DOJ TRIAL ATTORNEY
Court No. A5501735

\*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:**   **JOHN HOLLAND**

**Case No:**

Count #:   1

   18 U.S.C. § 1341

   Mail Fraud

**\*Max Penalty**:   Twenty (20) years' imprisonment

Count #:   2

   18 U.S.C. § 1347

   Health Care Fraud

\*Max Penalty:   Ten (10) years' imprisonment

Count #:   3 and 4

   18 U.S.C. § 1031

   Major Fraud Against the United States

**\*Max Penalty**:   Ten (10) years' imprisonment as to each count.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**