**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| | : | CRIMINAL ACTION NO. |
| v. | : | 1:17-CR-0234-AT |
| | : | |
| JOHN HOLLAND, et al., | : | |
| Defendants. | : | |

## ORDER

## I. BACKGROUND

Defendants John Holland, William Moore and Edmundo Cota have been charged in a thirteen-count second superseding indictment (the Indictment), alleging that they took part in an illegal kickback scheme involving bribes for patient referrals. [Doc. 121].[1] The Government alleges that in exchange for payments, Cota's health clinic ("Clinica") funneled pregnant Hispanic women in need of childbirth services to hospitals owned by Tenet Healthcare Corporation ("Tenet") and run by Holland and Moore. Defendants allegedly accomplished this scheme by entering into sham contracts that disguised the kickbacks as payments for various services purportedly

---

[1] For a much more extensive description of the Government's investigation of this matter, the allegations against the Defendants, and the procedural history of this case, see Magistrate Judge Catherine M. Salinas' Third Report and Recommendation, [Doc. 339], at 2-12.

provided by Clinica to the hospitals, but those services were either unnecessary or not properly provided.

There are a great many issues now pending before the undersigned, and this order is the beginning of an effort to resolve those issues. In this order, this Court will review the five Report and Recommendations that Magistrate Judge Catherine M. Salinas has submitted, which recommend that numerous motions filed by Defendants (except one) be denied.[2] This Court will also address Defendants' contentions that evidence of risk of harm to patients should be excluded and Defendants' motions seeking a James hearing.

## II. The Five R&Rs

### A. The First R&R

In her First Report and Recommendation (R&R1), [Doc. 306], Judge Salinas recommends that Holland's Motion to Dismiss 4, [Doc. 183], which has been adopted by Moore and Cota [Docs. 201, 209], Holland's Motion to Dismiss 6 [Doc. 186], which has been adopted by Cota [Doc. 214], and Holland's Motion to Dismiss 7 [Doc.

---

[2] Defendants Moore and Cota frequently have adopted in whole the substantive motions and objections filed on behalf of Defendant Holland—or filed their own briefs and additionally incorporated by reference Defendant Holland's briefing. Accordingly, while the Court frequently refers to Defendant Holland's arguments in this Order, those arguments, or a variant of the same (unless otherwise noted) have generally been adopted by Defendants Moore and Cota.

AO 72A
(Rev.8/82)

187], which also has been adopted by Cota [Doc. 217] be denied. In those motions, Defendants argue that a portion of Count One should be dismissed, and that Counts Two through Four should be dismissed entirely. Holland's objections to the R&R [Doc. 324] have been adopted by Moore. [Doc. 325].

In the R&R, Judge Salinas first correctly discusses the applicable legal standard and noted that

> At this stage in the litigation, the Court's role is limited to determining whether the indictment is legally sufficient. A legally sufficient indictment must (1) present the essential elements of the charged offense, (2) notify the accused of the charges against him, and (3) enable the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense. See United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009). The Eleventh Circuit has repeatedly made the point that unlike the procedural rules governing civil cases, the Federal Rules of Criminal Procedure contain no mechanism for a pre-trial determination of the sufficiency of the evidence, and motions seeking such relief in criminal cases are improper.

[Doc. 306 at 14].

Judge Salinas then reviewed Counts One through Four of the Indictment and concluded those counts were legally sufficient. Holland, joined by Moore where relevant, objects to the R&R in its entirety.

Count One of the Indictment alleges that Defendants conspired to defraud the United States and to pay and receive bribes in connection with a federal health care program, Counts Two through Four allege that Holland and Cota paid and/or received

the bribes. Defendants contend that the allegations in those counts are subjective and "incapable of being proven by any standard in a criminal case." [Doc. 324 at 5]. As mentioned above, the Government alleges that Holland and Moore paid bribes to Cota so that Cota's clinic, Clinica, would refer pregnant patients to Holland's and Moore's hospitals for delivery of their babies for which the hospitals could then bill Medicaid and Medicare. According to the Government, Defendants disguised the bribery payments by creating "pretextual contracts" for services, but the services were "(a) not needed and not justifiable; (b) duplicative of services already being provided; (c) substandard or problematic; (d) not rendered at all; and (e) rendered by persons who were not qualified to perform them." Indictment at ¶ 48. It is this portion of Count One that Defendants argue is subjective and incapable of proof. They argue that the "Indictment does not allege that the cost of [the] services [purportedly delivered under the allegedly sham contracts] varied from fair market value or that payment was made for services that were not actually rendered. Instead, the government attacks the quality of the services provided . . . ." [Doc. 324 at 10].

At the outset, this Court notes that while Defendants have quoted passages from the First R&R that they find objectionable, they have failed to specify how Judge Salinas erred. Instead, they raise the same arguments that Judge Salinas found unconvincing. Having reviewed the record, this Court finds that there is nothing

4

remarkable about the fact that the Government intends to show that the contracts between the hospitals and Clinica were sham contracts. If Defendants were entitled to dismissal based on Defendants' argument, it would be impossible for the Government to prosecute individuals for bribery in many instances because individuals engaged in such behavior routinely attempt to cover their tracks with sham paperwork.

Moreover, Defendants' assertions are simply wrong. The Government does, in fact, allege that services that were contracted for were not delivered. Indictment at ¶ 48(d). The remaining allegations—that the services were not needed, not justifiable, duplicative, substandard, or rendered by unqualified individuals—are all simply another way of saying that the value of the services rendered were worth less than fair market value. This Court further finds that, in making these allegations in the Indictment, the Government has clearly put Defendants on notice of what crimes they are accused of and the manner in which those crimes allegedly were committed.

Finally, in response to Defendants' repeated argument that the allegations in the Indictment are simply the government's subjective opinions over the quality of the services rendered by Clinica, this Court agrees with Judge Salinas that this argument goes to the weight of the evidence and is for the jury to determine.

AO 72A
(Rev.8/82)

Having reviewed the record in light of Defendants' objections, this Court now holds that Judge Salinas' findings and conclusions in the First R&R are correct.

## B. The Second R&R

In the Second R&R, [Doc. 332], Judge Salinas recommends that Moore's motion, [Doc. 262], as adopted by Defendant Holland, [Doc. 263], to sever Defendant Cota be denied.  Moore has objected, [Doc. 338], but Holland has not.

Holland and Moore first argue that Cota's out-of-court statements may be admitted during the trial, and if Cota does not testify, Holland's and Moore's Sixth Amendment right to confront witnesses against them will be violated as described by the Supreme Court in Bruton v. United States, 391 U.S. 123 (1968).  In concluding that Holland and Moore had failed to establish that severance is necessary under Bruton, Judge Salinas first found that

> Holland and Moore have not identified any statement Cota may have made that even mentioned—much less directly implicated—either of them in the crimes charged. Rather, the motion refers generally to statements Cota allegedly made discussing the relationship between Clinica and Tenet hospitals  and statements he made to Clinica patients telling them that they must deliver their babies at Tenet hospitals.

[Doc. 332 at 6-7].

As explained at length by Judge Salinas, because Cota's statements do not directly implicate Holland and Moore, severance is not required under Bruton.  See Richardson v. Marsh, 481 U.S. 200, 208 (1987).

6

Judge Salinas next concluded that Moore and Holland have failed to demonstrate that their defenses are antagonistic to those of Cota. According to Judge Salinas, Moore's and Holland's arguments are entirely conclusory in that they have failed "to even identify any particular defense that Cota might raise." [Doc. 332 at 8]. Judge Salinas further noted that, because Cota is charged with engaging in a conspiracy along with Holland and Moore, "it is highly unlikely that Cota would proclaim his innocence, while simultaneously condemning the actions of Moore and Holland." [Id. at 9].

Finally, Judge Salinas concluded that Holland's and Moore's arguments that severance is necessary because of potential spillover and cross-contamination of evidence are likewise conclusory and unconvincing because Moore and Holland "do not point to any particular piece of evidence that may be presented against Cota that they contend would unfairly prejudice them." [Id.].

Moore's objections mostly relate to the fact that Judge Salinas's schedule required that he file his motion to sever too early, and he argues that the Court should defer ruling on his motion until the Government has produced its exhibits and witness lists and Moore has had an opportunity to perfect his motion. This Court rejects that argument because a massive amount of discovery has been had in this matter, and the parties are sufficiently familiar with the allegations and evidence that could be

7

presented at trial such that, if a compelling reason for severance exists, they would know about it.  However, while keeping in mind that the default "is that defendants who are jointly indicted should be tried together, and this rule applies with particular force to conspiracy cases," <u>United States v. Walker</u>, 720 F.2d 1527, 1533 (11th Cir. 1983), this Court understands that circumstances change, and if a compelling reason for severance arises in the future, this Court may revisit the issue upon proper motion.

Moore next argues that severance is necessary because of the complexity of the Anti-Kickback Statute (AKS).  However, Moore's arguments are merely speculative. He contends, for example, that jurors will be confused, but other than raising complexity he does not present a plausible case for how confusion will arise that cannot be cured with limiting instructions.  <u>See</u> <u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993) (noting that measures less dramatic than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice").

Having reviewed the record in light of Defendants' objections, this Court now holds that Judge Salinas' findings and conclusions in the Second R&R are correct.

AO 72A
(Rev.8/82)

## C. The Third R&R

In the Third R&R, [Doc. 339], Judge Salinas recommends that Moore's Motion to Dismiss Based on Pre-Indictment Delay, [Doc. 177], Holland's Motion to Dismiss for Violation of Due Process, [Doc. 181], which has been adopted by Moore and Cota, [Docs. 199, 205], Cota's Motion to Dismiss Based on Pre-Indictment Delay, [Doc. 261], and Holland's Motion to Dismiss for alleged violation of his constitutional right to a speedy trial, [Doc. 180], all be denied. Cota, [Doc. 353], Moore, [Doc. 354], and Holland, [Doc. 356], have all objected. In addition, Cota has adopted Moore's and Holland's objections. [Docs. 359, 360].

### 1. Pre-Indictment Delay

In their motions to dismiss based on pre-indictment delay, Defendants contend that they have been prejudiced by the fact that the Government waited so long to bring the indictment. Normally, compliance with the applicable statute of limitations suffices to defeat any claim of pre-indictment delay. However, in extraordinary circumstances a criminal defendant may establish a due process violation in the case of an "oppressive delay" even though the indictment was filed within the statute of limitations. United States v. Lovasco, 431 U.S. 783, 789 (1977). In concluding that Defendants had failed to establish that they are entitled to have the Indictment dismissed on this ground, Judge Salinas first identified the proper standard for

AO 72A
(Rev.8/82)

evaluating Defendants' claim under <u>Lovasco</u> and correctly described the Defendants' burden as follows: "to succeed on their motions to dismiss for pre-indictment delay, each defendant must show: (1) that the pre-indictment delay was the result of a deliberate act by the Government designed to gain a tactical advantage; and (2) that the preindictment delay caused the defendant actual substantial prejudice." [Doc. 339 at 14]. She then found that Defendants' assertions of prejudice are too speculative and that the Government's reasons for the delay were not in bad faith or to gain a tactical advantage against Defendants but in a reasonable effort to avoid jeopardizing its investigation in this matter and parallel proceedings against Tenet and others. Judge Salinas further determined that Defendants are not entitled to a hearing because they had "presented no more than generalized allegations of misconduct and have failed to make a showing that an evidentiary hearing is warranted." [<u>Id.</u> at 26].

In his objections, Cota first argues that the Magistrate Judge failed to consider his claim under an alternative standard mentioned in <u>Lovasco</u>. In a footnote in that opinion, the Supreme Court stated:

> In [<u>United States v. Marion</u>, 404 U.S. 307 (1971)] we noted with approval that the Government conceded that a "tactical" delay would violate the Due Process Clause. The Government renews that concession here, Brief for United States 32, and expands it somewhat by stating: "A due process violation might also be made out upon a showing of prosecutorial delay incurred in *reckless disregard* of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense," <u>id.</u>, at 32-33, n.

AO 72A
(Rev.8/82)

25.   As the Government notes, however, there is no evidence of recklessness here.

Lovasco, 431 U.S. at 795 n.17 (emphasis added).

It is not at all clear from that dictum statement that the Supreme Court has adopted a "reckless disregard" standard for evaluating claims of pre-indictment delay. Moreover, even if this Court were to agree that Cota has raised plausible arguments as to how the delay has prejudiced him, he has not presented sufficient evidence that the Government was reckless in its disregard for his due process rights.  In any event, this Court is unconvinced that Cota has established actual, substantial prejudice.  He contends that (1) he cannot locate certain witnesses that the Government has identified and (2) some of the witnesses he can locate refuse to be interviewed because they are undocumented aliens and fear that they will be deported.

This Court acknowledges that Cota as well as his co-Defendants may encounter significant difficulty in locating former Clinica patient witnesses.  But most of those witnesses—especially those who may have concerns about their immigration status—would testify on the issue of harm to patients, and this Court's conclusion later in this Order that the evidence of risk of harm to patients is inadmissible, see infra discussion at § III, should substantially ameliorate Cota's (and his co-defendants') concerns.  Even if this Court were to admit some evidence of harm to patients, this Court further concludes that the prejudice that Cota (and his co-defendants) claims, at

11

least as presented at this juncture, is not sufficient to establish a due process violation. Cota's claim that he has experienced significant trouble locating witnesses or persuading those few located that they are safe to testify given the current immigration climate and dangers of deportation, does not establish a per se due process violation. "The standard of prejudice is fairly stringent." Stoner v. Graddick, 751 F.2d 1535, 1544 (11th Cir. 1985) (citing Tiemens v. United States, 724 F.2d 928, 929 (11th Cir. 1984)). "In Marion, the Supreme Court made it clear that when pre-indictment delay is asserted, actual prejudice and not merely 'the real possibility of prejudice inherent in any extended delay,' is a necessary element which must be shown before the restraints of the due process clause will be applied to bar a prosecution because of a delay." United States v. McGough, 510 F.2d 598, 604 (5th Cir. 1975) (quoting United States v. Marion, 404 U.S. at 307). Here, Cota has not established that the witnesses he cannot find or cannot interview are central to his defense. Indeed, those witnesses would mostly testify regarding the peripheral issue of patient harm, which does not implicate Cota's actual guilt of the crimes charged in the Indictment.[3]

---

[3] Defendant Cota (and his co-defendants) may renew their respective motions (to the extent each of the Defendants relied on this issue) or seek other appropriate relief, however, if patient harm evidence is admitted that Defendant(s) show cannot be rebutted based upon the witness circumstances discussed above.

In their objections, Moore and Holland argue more strenuously that the Government engaged in bad faith efforts to delay indicting them for tactical advantage. They argue that the record demonstrates that the Government had completed its investigation well before it brought charges against them. They further contend that the Government's decision to bring charges against Holland in Florida was also part of the Government's efforts to gain a tactical advantage against Defendants in this action.

The Government's decision to indict Holland in Florida as well as the Government's purported bad faith in general are recurring themes in many of Defendants' motions. Defendants contend that the Government knew that venue was improper in Florida and that the Florida indictment clearly demonstrates the Government's bad faith efforts to gain a tactical advantage. Judge Salinas pointed out that the district court in Florida denied Holland's first motion to change venue after deciding that the factors announced in Platt v. Minnesota Min. & Mfg. Co., 376 U.S. 240 (1964), weighed in favor of the Government. [Doc. 30]. Only after Holland filed a motion for reconsideration did the Florida court transfer the action here after issuing a detailed opinion. [Doc. 56]. That transfer, however, was entirely discretionary, and the Florida court made no finding that the Government acted in bad faith in first bringing the case there.

13

Having reviewed the record, including the orders of the Florida district court first refusing to, and then later agreeing to, transfer the case here, it appears that the Government had plausible, though not compelling, arguments in support of venue in Florida. Based on the Court's review of the Florida Magistrate Judge's extensive factual findings in its final transfer Order, [Doc. 56], as well as related record evidence, this Court concludes that the Government's decision to indict Holland in Florida does not appear to make much pragmatic sense. This, in turn, creates an inference that the Government sought to gain some tactical advantage in its choice of forum. In reaching this assessment, the Court points to several factors. First, most significantly, the Court considers the Florida Magistrate Judge's findings (upon review of supplemental submissions) that Holland and the great bulk of the witnesses, evidence, subject hospitals, and alleged sprawling criminal activity transpiring over many years are principally located in or occurred in Georgia. As Florida Magistrate Judge Jonathan Goodman further concluded, "The real meat and potatoes which will be served to the jury involve Georgia-based witnesses providing testimony about events occurring in Georgia." [Doc. 56 at 3] In finding that almost all of the extensive nuts and bolts evidence in this case resides within Georgia, Magistrate Judge Goodman also contrasted this to the limited matters occurring in Florida that were "largely administrative events" subject to a streamlined presentation. [Doc. 56 at 3, 26]. The

14

Court further notes that none of the Government's lead attorneys assigned to this

matter were based in Florida. Finally, the Court takes note that two grand juries were

empaneled in the Northern District of Georgia and heard evidence over a span of years,

concluding apparently in or around mid 2016—all before the Florida indictment of

Defendant Holland. These proceedings included the presentation of live testimony

from dozens[4] of witnesses.[5] Guilty pleas were taken by this Court in three related

cases.[6] The Government's sudden switch to proceeding in the Southern District of

---

[4] Both the Government and Defendants refer to hundreds of witnesses having been interviewed in the course of the Government's investigation. It is not clear to the Court what percentage of these witnesses actually testified in grand jury proceedings, but in any event, a large number did.

[5] Meanwhile, the civil False Claims Act case principally aimed at a range of hospitals operated by Tenet was filed under seal by a Relator in 2009 in the Middle District of Georgia, United States ex. rel. Williams v. Health Management Associates, Inc. et al., No. 3:09-CV-130 (DCL) (and amended in September 2011), culminating in the Government's formally intervening in late 2014 and reaching a settlement with Tenet for a total of $368 million. See Notice of Settlement dated October 3, 2016 in 3:09-CV-130 (DCL) [Doc. 222], and Government's Consolidated Response in this criminal case [Doc. 259 at 4]. Simultaneous to the civil settlement, Atlanta Medical Center and North Fulton Hospital, in their corporate capacity, entered a guilty plea to a one count information in this Court. United States v. Atlanta Medical Center, et al., 1:16-CR-350-1-AT, Doc. 1 (N.D. Ga. Oct. 2, 2016). No evidence has been introduced suggesting that the delay in handling of the civil case was associated with the individual defendants in the instant case.

[6] See United States. v. Tracey Cota, 1:14-CR-275-AT at Doc. 10-1 (N.D. Ga. Aug.. 6, 2014; United States v. Gary Lang, 1:14-CR-274-AT at Doc. 10 (N.D. Ga. Aug. 6 2014); United States v. Atlanta Medical Center, et al. 1:16-CR-350-1-AT, Doc. 1 (N.D. Ga. Oct. 2, 2016).

15

Florida seems to have occurred at the last moment in late 2016 or early 2017, and relied upon the condensed presentation to the Florida grand jury of summaries of witness testimony that had been given in person to the grand juries in Atlanta. The indictment in Florida was issued on January 24, 2017.[7]  Similarly, when the case was later transferred to Atlanta and Moore and Cota were thereafter added as defendants in the governing second superseding indictment  [Doc. 121, September 26, 2017], summaries of earlier witness testimony were relied upon by the grand jury.

The Government, of course, has the discretion to choose among those forums where venue is proper, United States v. Bradley, 644 F.3d 1213, 1252-53 (11th Cir. 2011) ("So long as its choice does not create a constitutional hardship, the Government may choose, from among those districts, one where it is most convenient to pursue an indictment."), and in making that choice, tactical advantage is likely a

---

[7] As a matter of standard professional practice in the Northern District of Georgia, counsel for Defendants Moore and Holland represent that they had endeavored to be in continual contact with the prosecution on behalf of their clients (who had been identified as targets of the investigation) so as to have the opportunity to address potential charges prior to the issuance of the grand jury indictment.  They represent that they were lead to believe Government counsel would remain in touch and give them this opportunity. Moore's counsel represents additionally that he was advised by the Government that a decision as to Moore's indictment would be issued originally in 2014. The Government's indictment of Holland in January 2017, occurring amidst ongoing arrangements for such a meeting, clearly came as a total surprise to Defendants and was a source of bitter relations between counsel as well as suspicion.

consideration. Everything else being equal, the Government is permitted to choose the forum where it believes that its chances for success are better. To the degree that Holland contends that the tactical advantage that the Government sought in bringing the criminal action in Florida was unfair, that unfairness was largely cured by the transfer here. Though the Court recognizes that the Government's Florida excursion may have been driven by questionable tactics, these tactics have not been shown to reflect a deliberate Government effort to cause pre-indictment delay as opposed to gain some form of strategic trial advantage. Despite the concerns the Court has noted, it agrees with Judge Salinas that there is not sufficient evidence to rise to the level of demonstrating bad faith by the Government and a constitutional due process violation. That said, the Court notes its strong concern that the Government attempted to prosecute Holland in Florida when the Northern District of Georgia was the most obvious forum and that this course of action left a bitter professional trail.

More generally, while this Court is willing to accept Defendants' argument that the Government could have indicted them sooner, the reason for the delay is not as clear or as dispute-free as Defendants make out. Defendants level various *post hoc* accusations that the Government delayed indicting them for tactical reasons, but they have failed to point to "facts or evidence from which the Court could infer that the Government's delay was a deliberate act to gain a tactical advantage" causing a

AO 72A
(Rev.8/82)

prejudice to the defendants "which the government anticipates will flow from the delay." United States v. Foxman, 87 F.3d 1220, 1223, n. 2 (11th Cir. 1996). As further stated by Judge Salinas,

> the Government states that to the extent there was a delay, it was due to the sheer breadth and multiple moving parts inherent in this investigation, which involved both criminal and civil investigations; receiving and reviewing voluminous documents and data from Tenet and other third parties; hundreds of witness interviews and testimony before the grand jury; guilty pleas by two individuals to a conspiracy to pay and receive health care bribes; a global resolution by and between the United States, the states of Georgia and South Carolina, Tenet, Tenet HealthSystem Medical, Inc. and their subsidiary hospitals to resolve their criminal, civil, and administrative liability; and a continued investigation to assess the viability of charges against other individuals and entities.

[Doc. 339 at 18].

Defendants have not disputed that the multiple investigations in this case have been extraordinarily complex and wide-ranging, involving multi-million dollar schemes, multiple hospitals, multiple governmental agencies, a series of grand juries, parallel civil and criminal lawsuits, hundreds of witnesses, and millions of pages of documents. Given the high level of complexity and challenges of proof, this Court finds that the Government's rationale for its extended investigation is reasonable and believable — and that the Government's pursuit of its investigation on multiple fronts prior to proceeding with an indictment is consistent with the Supreme Court's guidance in Lovasco, 431 U.S. at 789-794 (recognizing that prosecution's delay for investigative

purposes should generally be treated differently than delay for other purposes). While Defendants present legitimate concerns with regard to the prosecution's Southern District excursion and associated bad faith contentions, their presentation is not sufficient to disprove the Government's overarching rationale for the time expended in the years prior to the running of the statute of limitations or alternatively, given this Court a reasonable basis to believe their version of events over that of the Government.[8] As Defendants clearly bear this burden, this failure is fatal to their motion at this juncture.

### 2. Fed. R. Crim. P. 6(e)

In the Third R&R, Judge Salinas also concludes that Defendants' arguments that the Indictment should be dismissed under Fed. R. Crim. P. 6(e) because of the Government's alleged breaches of grand jury secrecy requirements are without merit. According to Judge Salinas,

> Rule 6(e) of the Federal Rules of Criminal Procedure requires that attorneys for the Government not disclose matters occurring before the grand jury except in specified circumstances. In Holland's Motion to Dismiss-2 (as adopted by Moore and Cota), Holland asserts that in January 2015, a former prosecutor involved in the Government's investigation improperly discussed aspects of the ongoing grand jury

---

[8] The Court, however, recognizes the Eleventh Circuit's observation in <u>Foxman</u> that ". . . where an investigation is itself delayed by the government for tactical reasons, the fact that an investigation was involved might be no bar to a due process violation." <u>Foxman</u>, 87 F.3d at 1223, n. 2.

AO 72A
(Rev.8/82)

investigation of Tenet with another passenger during a conversation on a commercial airline flight. [Doc. 181 at 11-12]. The other passenger turned out to be the former chief of staff to Tenet Healthcare Corporation's Chief Executive Officer. [Id. at 12]. Holland argues that this disclosure of information "had the potential of infecting the testimony of potential witnesses even at the highest level of the company." [Id. at 13].

Holland further asserts that on another occasion in 2015, a different prosecutor involved in the Government's investigation improperly discussed aspects of the investigation with the employer of a former employee of the Atlanta Medical Center, possibly in an attempt to intimidate that witness. [Doc. 181 at 13-16]. Such disclosures, according to Defendant Holland, somehow "damaged his ability to receive a fair trial." [Id. at 16].

[Doc. 339 at 28-29].

Relying on Midland Asphalt Corp. v. United States, 489 U.S. 794, 802 (1989) ("Only a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment, gives rise to the constitutional right not to be tried. An isolated breach of the traditional secrecy requirements does not do so."), Judge Salinas concluded that Defendants had "failed to articulate any basis upon which the Court could find that the isolated breaches . . . in any way damaged [their] ability to receive a fair trial or give rise to a constitutional right not to be tried." [Doc. 339 at 30].

In his objections, Holland argues that Judge Salinas erred because the Midland case that she relies on discusses a "right not to be tried," but Holland seeks dismissal

of the indictment which, he contends, is fundamentally different. Holland further repeats his argument from his Motion to Dismiss that dismissal is warranted to deter prosecutorial misconduct and because the allegedly improper disclosures by Government attorneys caused him prejudice.

This Court first notes that it has reviewed Holland's allegations that prosecutors divulged secret grand jury material, [Doc. 181 at 11-16], and finds that the purported disclosures, while strange, were not major—at worst, the prosecutors divulged only that the grand jury was investigating Tenet and its officials and that the Government possessed strong evidence in the case.

More important to this Court's conclusion that he is not entitled to dismissal under Rule 6(e), Holland has failed to demonstrate that he was unfairly prejudiced by the Government's supposed disclosures. As Holland points out, the Supreme Court in Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988) held that "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." Here, while Holland asserts in conclusory form that the Government's disclosures "damaged [his] ability to receive a fair trial," [Doc. 181 at 11], he has made no showing of prejudice.[9]

---

[9] Having concluded that the Government's actions did not violate Petitioner's rights or harm his chances to a fair trial, this Court nonetheless believes that, if true, Holland's account of the Government's attorney's apparent "ambushing" of a Tenet executive on a commercial airliner was unprofessional and an unacceptable manner to

AO 72A
(Rev.8/82)

### 3. Post-Indictment Delay/Speedy Trial

Finally in the Third R&R, Judge Salinas concludes that Holland's claim of post-indictment delay or denial of his right to a speedy trial is unavailing. Judge Salinas properly identified the four-factor test to determine whether a post-indictment delay has caused a speedy trial violation under <u>Barker v. Wingo</u>, 407 U.S. 514 (1972): (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the speedy trial right; and (4) the prejudice to the defendant. <u>See id.</u> at 530. She then determined that, as of the time that he filed his motion, the delay—then less than a year—was not presumptively prejudicial. [Doc. 339 at 33 (citing <u>United States v. Knight</u>, 562 F.3d 1314, 1323 (11th Cir. 2009))].

Judge Salinas further found that under the second <u>Barker</u> factor—the reason for the delay—does not weigh against the Government. In the undersigned's analysis, this is the most salient factor in this case. As Judge Salinas pointed out, the second factor weighs "whether the government or the criminal defendant is more to blame for th[e] delay," <u>Vermont v. Brillon</u>, 556 U.S. 81, 90 (2009), and it is clear that Defendants bear the blame for much, if not most, of the post-indictment delay in this matter. Defendants have sought numerous extensions in this matter, and they have filed a large volume of pretrial motions, some of them meritless.

---

convey confidential information. Likewise, the Government's actions in connection with Lisa Napier are equally concerning.

In addition, Judge Salinas noted that <u>Barker</u> differentiated between "an ordinary street crime" and "a serious, complex conspiracy charge," noting that what may be considered a lengthy delay for the former may not be considered a lengthy delay for the latter. <u>Barker</u>, 407 U.S. at 530-31. This Court agrees that any delay in this matter is validly based upon the case's significant complexity—which necessarily influences the volume of work, the amount of time in which it is to be accomplished, and the number of individuals involved—rather than due to unwarranted, deliberate delay by the Government.

Judge Salinas also found that the third <u>Barker</u> factor—whether Holland adequately asserted his speedy trial rights—does not weigh against the Government because Holland waited almost a year before raising the issue and he has repeatedly sought extensions. Finally, Judge Salinas found that Holland had failed to demonstrate sufficient prejudice to establish a speedy trial violation.

In his objections, Holland (and his co-defendants) contends that Judge Salinas erred with respect to her evaluation of each of the four <u>Barker</u> factors. His argument regarding the first factor is irrelevant because that factor—the length of the delay—merely determines whether the court must consider the other three factors. The defendant must show that the period of delay is "presumptively prejudicial," and, if not, court need not consider the other factors. <u>United States v. Knight</u>, 562 F.3d 1314,

23

1323 (11th Cir. 2009). While Judge Salinas found no presumptively prejudicial delay, she nonetheless considered the other factors as well, which is all that a finding of a presumptively prejudicial delay requires.

As to the second factor, Holland contends that the Magistrate Judge erred in finding that the Government has not acted in bad faith. As mentioned above, this Court does have concerns regarding the Government's actions in relation to this case. However, this Court has reviewed the record and deems Judge Salinas' finding that there is no evidence of bad faith on the part of the Government to be correct. This Court further finds that neither was the Government grossly negligent in its handling of this matter in response to Holland's objection to that effect. [See Doc. 356 at 28]. Because the remainder of Holland's objections regarding the third Barker factor are premised on the Government's bad faith, and because this Court has not found bad faith of a constitutional or significant dimension here, those remaining objections are unavailing.

This Court also notes that Holland is incorrect in claiming that Judge Salinas "impermissibly requir[ed]" a finding of bad faith in order to find that the third factor weighed against the Government. [See id. at 29]. Rather, as discussed above, Judge Salinas determined that Holland's own extensive pretrial motions practice was to blame for much of the delay in this matter.

AO 72A
(Rev.8/82)

Regarding the third <u>Barker</u> factor, Holland contends that Judge Salinas erred in finding that this factor favored the Government because Holland waited almost a year to file his motion. According to Holland, Judge Salinas "inexplicably found" that the delay was not presumptively prejudicial while at the same time determining that he waited too long to file his speedy trial motion to satisfy the third <u>Barker</u> factor. [Doc. 356 at 30]. Holland, however, has oversimplified the analysis. In weighing the third factor, courts consider whether there has been an indication that the defendant was concerned about his speedy trial rights over the course of the proceeding. For example, in <u>United States v. Register</u>, 182 F.3d 820 (11th Cir. 1999), the Eleventh Circuit concluded that the third factor did not weigh against the Government even though the defendant had filed two motions for a speedy trial because he had also moved for a continuance on four occasions. <u>Id.</u> at 828. Here, up until Holland filed his motion, he gave no indication that he sought a speedy trial. His extensive motions practice further indicates that he is in no particular hurry, although the Court recognizes that Holland and his co-defendants have all expressed strong concerns regarding the availability and disappearance of witnesses over time. Moreover, because this Court has determined that the second factor (the reason for the delay) does not weigh against the Government in connection with defendant's post-indictment speedy trial claim, Holland must demonstrate prejudice regardless of whether the third factor

25

weighs in his favor, Register, 182 F.3d at 827, and this Court agrees with the Magistrate Judge that Holland has not established prejudice.

In objecting to Judge Salinas' determination that he had not demonstrated prejudice, Holland argues that she erred in not granting a hearing at which he could establish prejudice. "Prejudice to the defendant is evaluated in view of the three interests the right to a speedy trial was designed to protect: '(1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired.'" United States v. Schlei, 122 F.3d 944, 988 (11th Cir. 1997) (quoting Barker, 407 U.S. at 532). Of these three interests, the third is the most significant. Ringstaff v. Howard, 885 F.2d 1542, 1545 (11th Cir. 1989).

As Holland is not incarcerated, the first factor does not apply. Regarding the second factor, Holland contends that he

> has been gravely concerned and anxious about this matter now for years, and has had to seek medical and professional services for anxiety and other stress-related symptoms he has suffered as a result of these proceedings. Despite this being one of the prejudice factors that courts consider for speedy trial claims, the Third R&R minimized it, finding that "[a]nxiety and stress . . . are inherent in any prosecution." (Doc. 339 at 42.) Mr. Holland explained that he would present evidence of his treatment at an evidentiary hearing if necessary, as such evidence includes his private medical information, but the Third R&R denied his request and concluded that he only presented "general conclusory allegations [that] are insufficient to constitute proof of actual prejudice." (Doc. 339 at 42.)

[Doc. 356 at 32].

However, circuit law supports Judge Salinas's characterization of Holland's claims of anxiety.

> Anxiety of the sort present to some degree in virtually every case does not amount to actual prejudice. Were the appellants shown to have suffered particular hardships or was this a capital case, where the anxiety would justifiably be more severe, we would accord the appellants' allegations greater weight.

United States v. Avalos, 541 F.2d 1100, 1115 (5th Cir. 1976).

Being the subject of a criminal prosecution is a highly unpleasant experience, and this Court sympathizes with the position of the defendants. Nonetheless, this Court agrees with the Judge Salinas that Holland (and his co-defendants) has not demonstrated that his anxiety was "of such an extreme degree that it differed in any way from that which would naturally be expected to accompany a defendant's awareness of pending charges," Goodrum v. Quarterman, 547 F.3d 249, 263 (5th Cir. 2008), and that Holland has not established that he is at all likely to make such a showing at a hearing.

This Court further agrees with Judge Salinas' determination that Holland has failed to establish that his defense of the charges against him has been impaired. Judge Salinas found (1) that Holland's conclusory allegations of "general prejudice from faded memories and the inability of several witnesses who testified before the grand

AO 72A
(Rev.8/82)

jury to recall specific details due to the passage of time . . . fail to satisfy the burden of showing actual prejudice," [Doc. 339 at 43]; and (2) that Holland

> failed to demonstrate that his defense has been impaired as a result of one physician witness passing away back in 2014 and pre- and post-indictment difficulties trying to locate 'several likely helpful witnesses' and exculpatory documents. Holland makes no representations about what the testimony might have been or what the documents might have shown, nor does he argue that the testimony or evidence would have been material to his defense, that no other witnesses are available who could testify to the same thing, or that the loss of these witnesses and/or documents in some significant way has impaired his ability to mount a defense.

[Id. at 43-44]. And to the extent that time delay and circumstances may have prejudicially impacted Holland or his co-defendants' ability to locate witnesses to respond to possible "harm to patient" testimony, this potential source of prejudice has been addressed by the Court herein.

In his objections, Holland generally disputes Judge Salinas' findings, but he has failed to assert prejudice with the specificity that Judge Salinas found lacking. Having reviewed the record, this Court concludes that Judge Salinas is correct that Holland has failed to establish that he is entitled to dismissal of this action because of a violation of his Sixth Amendment speedy trial rights.

**4. Fed. R. Crim. P. 48(b)**

Finally, it is clear that Judge Salinas is correct that Defendants have no right to relief under Fed. R. Crim. P. 48(b). Rule 48(b) reaffirms the Court's inherent power

to dismiss a case for want of prosecution where there has been an unnecessary delay in presenting a charge to a grand jury, filing an information against a defendant, or bringing a defendant to trial. This Court has considerable discretion in determining whether to grant relief under the rule, "and dismissal is mandatory only if the defendant's constitutional rights have been violated." United States v. Butler, 792 F.2d 1528, 1533 (11th Cir. 1986) (citing United States v. Edwards, 577 F.2d 883, 887 n.1 (5th Cir. 1978). This Court has not found a constitutional violation; Judge Salinas is correct that Defendants have failed to establish that they are entitled to relief under Rule 48(b); and nothing in Defendants' objections has convinced this Court that Judge Salinas erred.

In summary, having reviewed the record in light of Defendants' objections, this Court now holds that Judge Salinas' findings and conclusions in the Third R&R are correct.

## D. The Fourth R&R

Holland has filed a motion to dismiss for improper venue. [Doc. 188]. In the Fourth R&R, [Doc. 348], Judge Salinas notes that both Holland and the Government agree that Count Ten of the Indictment, charging Defendant John Holland with falsification of books and records, should be dismissed for lack of venue.[10] The

---

[10] Venue on that count lies in the Northern District of Texas.

dispute is over whether Count Ten should be dismissed with or without prejudice. Judge Salinas has recommended that the dismissal should be without prejudice because all of the cases that Holland has cited in support of his arguments are either inapplicable or materially distinguishable, and he has thus failed to demonstrate that this Court is authorized to dismiss the charge with prejudice. [Doc. 348].

In his objections, [Doc. 352], Holland again accuses the Government of bad faith for indicting him in Florida and by changing the charges against him when re-indicting him in this District. He further contends that the Government's presentment of the charges in Count Ten to the grand jury in this District despite the obviously improper venue constitutes further evidence of bad faith.

Holland admits that the Government could try him on Count Ten if he were to waive his venue rights and that a trial on Count Ten in the Northern District of Texas would be largely duplicative of the trial in this action. Moreover, the Government stated in the Indictment itself that venue for Count Ten lies in the Northern District of Texas, and after Holland filed his motion, the Government readily admitted that the motion should be granted, though it may have hoped to be able to litigate all charges against Holland in one forum. It is thus clear that the Government was not trying to "hide the ball" or otherwise act in a nefarious fashion.

Most significant to this discussion, however, is the fact that Holland has failed to effectively argue that Judge Salinas erred in her conclusion that Count Ten should be dismissed without prejudice. In response to Holland's contentions in his objections and after a de novo review of the record, this Court finds that the Government has not acted in bad faith or has harassed (or is harassing) Holland in connection with Count Ten of the Indictment. Contrary to Holland's contentions, this Court finds that dismissal of Count Ten without prejudice would not result in harassment of Holland or otherwise be contrary to the manifest public interest, it would not condone disregard for the Federal Rules of Criminal Procedure, and it would not be fundamentally unfair. [See Doc. 352 at 12 (citing United States v. Karake, No. CRIM.A. 02-00256 ESH, 2007 WL 8045732 at *1-3 (D.D.C. Feb. 7, 2007))]. And of course, Holland could waive venue with respect to Count Ten to avoid the daunting psychological specter of facing prosecution in Texas as well as in this Court.

Having reviewed the record in light of Defendants' objections, this Court now holds that Judge Salinas' findings and conclusions in the Fourth R&R are correct.

**E. The Fifth R&R**

In the Fifth R&R, [Doc. 357], Judge Salinas recommends that the following motions be denied: Defendant John Holland's motion to compel in which Holland asks the Court to require the Government to elect between the two theories of conspiracy

alleged in Count One, which has been adopted by Defendant William Moore and Defendant Edmundo Cota, [Docs. 185, 204, 213], Holland's motion to dismiss for failure to allege fraud, which has been adopted by Moore and Cota, [Docs. 184, 202, 211], Holland's motion to dismiss Count Twelve for defective allegations and lack of materiality, which has been adopted by Moore regarding Count Thirteen, [Docs. 189, 206], Holland's motion to dismiss Count Twelve based on the Ex Post Facto Clause, which has been adopted by Moore regarding Count Thirteen, [Docs. 190, 208], Holland's motion to dismiss the Government's "One Purpose" Theory of Prosecution, which has been adopted by Moore and Cota, [Docs. 264, 270, 282], and Holland's motion to dismiss based on abuse of the grand jury, which has been adopted by Moore and Cota, [Docs. 182, 200, 207]. Moore, [Doc. 363 as supplemented by Doc. 367], and Holland, [Doc. 365], have filed objections.

**1. Motion to Compel Election of Theories**

As explained in much more detail in the R&R, in their motion to compel, Defendants complain that Count One of the Indictment alleges that (1) they conspired to both pay and receive bribes in connection with a federal health care program and (2) conspired to impede the lawful functions of the Medicaid and Medicare Programs. Defendants argue that Count One is duplicitous because both prongs of 18 U.S.C.

§ 371 are alleged in a single count, and the Government should be required to elect between "the two theories of conspiracy."

Judge Salinas has concluded that the indictment is not duplicitous as described by the Eleventh Circuit in United States v. Ramos, 666 F.2d 469, 473 (11th Cir. 1982), because the crime alleged under § 371 is a conspiracy, and under Supreme Court precedent, a count alleging a conspiracy to commit more than one crime is not duplicitous. Braverman v. United States, 317 U.S. 49, 54 (1942); see May v. United States, 175 F.2d 994 (D.C. Cir. 1949) (holding that a violation of both prongs of § 371 may be alleged in a single conspiracy count without charging more than one offense, and stating "neither a multiplicity of objects nor a multiplicity of means converts a single conspiracy into more than one offense").

In their objections, Moore and Holland argue that Judge Salinas failed to analyze § 371 to determine if it establishes two separate and distinct crimes under the test announced in Blockburger v. United States, 284 U.S. 299, 304 (1932) ("The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

33

This Court is not convinced that the statutory analysis and application of the Blockburger test that Holland and Moore urge this Court to undertake is applicable. The evil of duplicity—one count listing two crimes—arises from the possibility that some jurors might find that the defendant committed one crime listed in the count while others might disagree but find that the defendant committed the other crime. The result is a jury that only appears to be unanimous. With a conspiracy count, it is the conspiracy that matters and not what the defendants conspired to do. The indictment can allege multiple objects of the conspiracy, and even if the jurors disagree as to what the object of the conspiracy was, they can unanimously agree that the defendants conspired to commit some crime. See United States v. Mathis, 239 Fed. Appx. 513, 516 (11th Cir. 2007) ("[T]he conspiracy count simply charged two objectives for the conspiracy, not duplicitous offenses."). As a result, it does not matter whether § 371 establishes two distinct crimes because Count One alleges a conspiracy.

This Court further points to the reasoning of the Ninth Circuit in United States v. Smith, 891 F.2d 703, 711-13 (9th Cir. 1989), amended by, 906 F.2d 385 (9th Cir. 1990) (concluding that "[a]lthough there is no helpful legislative history, the two clauses should be interpreted to establish alternate means of commission, not separate offenses" and holding that both prongs of § 371 can be charged in a single count without being duplicitous).

34

However, there is a significant body of case law that holds that the two clauses of § 371 are separate offenses. <u>E.g.</u>, <u>United States v. Thompson</u>, 814 F.2d 1472, 1475-77 (10th Cir. 1987); <u>United States v. Haga</u>, 821 F.2d 1036, 1039 (5th Cir. 1987) ("Cases construing section 371 have made it plain that the 'commit any offense' clause and the 'defraud the United States' clause describe different criminal offenses."); <u>United States v. Minarik</u>, 875 F.2d 1186, 1194 (6th Cir. 1989). Given that case law and the absence of clear direction from the Eleventh Circuit, this Court has determined that, in order to avoid error, it will render the issue moot by requiring the jury to make specific findings with respect to whether Defendants conspired to either commit any offense against the United States, defraud the United States, or both. <u>Cf.</u>, <u>United States v. Schlei</u>, 122 F.3d 944, 978-79 (11th Cir. 1997) (discussing duplicitous offense charging issues and fatal absence of related unanimity jury charge as to such in a securities fraud case).

## 2. Motions to Dismiss for Failure to Allege Fraud

In their Motions to Dismiss for Failure to Allege Fraud, [Docs. 184, 202, 211], Defendants argue that the various fraud counts in the Indictment must be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v). In related motions, Holland and Moore seek to dismiss Counts Twelve and Thirteen for failure to allege materiality and for failure to allege fraud with sufficient specificity. [Docs. 189, 206]. According to

35

Defendants, the fraud charges fail to allege the essential element of fraud—that the United States actually lost money, property or something of value as a result of their misconduct. Defendants contend that their hospitals provided the services that were paid for by the Government.

In concluding that these motions should be denied, Judge Salinas again identified the correct legal standard, which is the same standard that she applied to Defendants other motions to dismiss of determining whether the indictment is legally sufficient. See *supra* discussion at § II.A. She then concluded that Defendants' arguments failed because the Indictment alleges that Defendants committed fraud by causing the United States to pay for medical services that it otherwise would not have paid for and that the payments for those services were tainted by the bribes that Defendants paid and received. Judge Salinas then provided a lengthy analysis of each challenged count of the Indictment and correctly concluded that the allegations satisfy the requirements for each violation alleged.

In their objections, as in their original motions, Defendants rely heavily on the Eleventh Circuit's analysis in United States v. Takhalov, 827 F.3d 1307 (11th Cir. 2016). Oversimplifying, Takhalov concerned the question of whether it was fraud for a bar owner to hire women to approach men and lie to them by posing as foreign tourists to lure the men into the bar. The Eleventh Circuit concluded it was not fraud

because the men lost nothing of value in the scheme; the bar owner provided the purported victims with "exactly what they asked for and charged them exactly what they agreed to pay." Id. at 1310.

Defendants contend that the Indictment charges them with fraud for merely doing what Takhalov did. They provided exactly the services that the United States agreed to pay for, and the United States lost nothing of value. The problem with Defendants' argument, of course, is that there is a qualitative difference between a bar owner hiring women to deceptively entice willing men into his bar and a hospital paying bribes to a clinic in exchange for the clinic referring its patients to the hospital, and the Eleventh Circuit clearly recognizes that difference.

For example in United States v. Sams, --- F. Appx. ---, Case No. 17-15761, 2019 WL 1756473 at *3 (11th Cir. Apr. 18, 2019), the defendant persuaded his victim to hire a sham company to develop a computer application, but "despite all of the lies and misrepresentations, it appears that the defendant wanted and expected the app to succeed; and with help from some (mostly Russian) contract engineers that he hired, he eventually completed it and delivered it to [the victim] pursuant to the contract." Id. at *1. In determining that the there was sufficient evidence of a scheme to defraud, the Eleventh Circuit engaged in a lengthy analysis of Takhalov, and distinguished that

AO 72A
(Rev.8/82)

case because the <u>Sams</u> victim would not have entered the contract if he had known the truth regarding who and how the contract would be executed.

Significant to this matter is that in <u>Sams</u>, the Eleventh Circuit cited with approval to <u>United States v. Maxwell</u>, 579 F.3d 1282, 1299 (11th Cir. 2009). In <u>Maxwell</u>, the defendant was the executive in charge of an office of a large contracting company. <u>Id.</u> at 1288. The defendant won several contracts to do electrical work for the United States by representing that small or disadvantaged businesses, or both, were performing a "commercially useful function in the completion of the contract[s]" when, in fact, those businesses were merely passing payments along to the defendant's company, which was performing all of the work. <u>Id.</u> at 1288-89. The defendant's company performed on the contracts—in other words, the United States got exactly what it expected and paid exactly what it agreed to pay. Nonetheless, the Eleventh Circuit held that the defendant's deception constituted a "scheme to defraud" because the defendant "dishonestly circumvent[ed] the worthy purpose" of the government's regulatory provisions that expressly required the prime contractor to engage the minority sub-contractor in the actual performance of work covered by the contract. <u>Id.</u> at 1303. The Court notes though that in both <u>Sams</u> and <u>Maxwell</u>, the work covered by the government contract was performed by different personnel or contractors than was expressly or implicitly provided for in the contract. The Court in <u>Sams</u>, recounting the

central holding of <u>Takhalov</u>, stated that "if a Defendant does not intend to harm the victim by obtaining "'by deceptive means, something to which [the defendant] is not entitled' – then he has not intended to defraud the victim." <u>Sams,</u> 2019 WL 1756473 at *2 (citing <u>Takhalov</u>, 827 F.3d at 1313).

In this case, the Government alleges that Holland and Moore paid bribes to Cota, and in exchange Cota referred patients to Holland's and Moore's hospitals with the result that the United States paid for those patients' care. As in <u>Maxwell</u>—the precedent of which survives <u>Tahhalov</u> as evidenced by the Eleventh Circuit's reliance on it in <u>Sams</u>—Defendants allegedly dishonestly circumvented through intentional fraud the worthy purpose of the Government's anti-kickback contracting requirements as expressed in the AKS. A jury could find otherwise based on the evidence presented. But in any event, even recognizing that *Sams* is an unpublished decision, the Court under the circumstances presented in this case, must find that Defendants are not entitled to dismissal of the fraud counts against them because the controverted issue here involves a factual dispute, as currently teed up at least, that requires jury resolution.

### 3. Motion to Dismiss Counts Twelve and Thirteen

Counts Twelve and Thirteen of the Indictment allege that Holland and Moore violated the major fraud statute, 18 U.S.C. § 1031. As discussed by Judge Salinas, the

AO 72A
(Rev.8/82)

elements of this crime, tailored to the facts of this case, are: (1) that the defendant knowingly executed a scheme with the intent to defraud the United States, or to obtain money by means of materially false or fraudulent pretenses, representations, and promises; (2) that the scheme took place in connection with a form of Federal assistance; and (3) that the value of such Federal assistance, or any constituent part thereof, was one million dollars or more. The Indictment alleges that Holland and Moore defrauded the United States by making materially false statements in certain "cost reports."

Holland and Moore argue that the two counts must be dismissed because the Indictment fails to specify what particular statement in the cost reports is alleged to be materially false. Judge Salinas disagreed, noting that the Indictment clearly alleges that Moore and Holland's certification regarding compliance with the AKS is the material misrepresentation. Judge Salinas further concluded that Holland and Moore's misrepresentation in the cost reports that the services identified in those reports were provided in compliance with the AKS was material because the Government made a facially sufficient allegation of materiality by alleging that Medicare would not pay funds to a provider hospital for patient services that Medicare knew were the result of a violation of the AKS.

AO 72A
(Rev.8/82)

In their objections, Holland and Moore argue that Judge Salinas failed to address their argument that, relying on <u>Universal Health Servs., Inc. v. United States ex rel. Escobar</u>, 136 S. Ct. 1989 (2016), the certifications in the cost reports cannot be material as a matter of law. Part of the holding of <u>Escobar</u> was that not every statutory, regulatory, or contractual violation is material even if "the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." <u>Id.</u> at 2004. "The False Claims Act does not adopt such an extraordinarily expansive view of liability." <u>Id.</u>

However, the problem with Holland and Moore's argument is that it is clear that <u>Escobar</u> was discussing an evidentiary standard, not a standard for evaluating the sufficiency of an allegation in an indictment:

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, *evidence* that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong *evidence* that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong *evidence* that the requirements are not material.

<u>Id.</u> at 2003-04 (emphasis added).

AO 72A
(Rev.8/82)

After <u>Escobar</u>, materiality in this context is not a mixed question of law and fact as Holland would have this Court believe. Rather, it is an element of the crime and thus an issue for the jury to determine.

Holland also objects based on his contention that he did not make the representations in the cost reports because that was not his role with Tenet at the time the cost reports were submitted, and he has submitted exhibits in support of that claim. Judge Salinas concluded that this Court cannot rely on facts outside the Indictment or make a pretrial ruling regarding the sufficiency of Holland's evidence. [Doc. 357 at 19 n.3]. This Court agrees, and, according to the case Holland cited in his objections, <u>United States v. Salman</u>, 378 F.3d 1266, 1267-68 (11th Cir. 2004) ("A motion for acquittal under Rule 29 is the proper avenue for contesting the sufficiency of the evidence in criminal cases because there is no explicit authority to grant a pre-trial judgment as a matter of law on the merits under the Federal Rules of Criminal Procedure."), so does the Eleventh Circuit.[11]

**4. Motions to Dismiss Counts Twelve and Thirteen based on the Ex Post Facto Clause**

---

[11] Having so held, this Court expects that if Holland can reliably demonstrate that he was not involved in the preparation of the subject cost reports, the Government should be willing to stipulate to that fact.

Holland and Moore have also filed motions to dismiss Counts Twelve and Thirteen because the counts purportedly violate their Ex Post Facto rights. [Docs. 190, 208]. As explained by Judge Salinas:

> As discussed above, 18 U.S.C. § 1031 prohibits the execution (or attempted execution) of a scheme to defraud the United States. On May 20, 2009, § 1031 was amended, expanding its reach to fraudulent schemes like the one alleged in this case, i.e., a scheme related to any "form of Federal assistance." In their motion, Holland and Moore complain that the conduct with which they are charged in Counts Twelve and Thirteen was not made illegal until 2009. They acknowledge, however, that the Indictment alleges that they submitted the 2011 Cost Reports in 2013, well after the statutory change, but they nevertheless argue that the Court should dismiss Counts Twelve and Thirteen because those counts incorporate allegations of certain conduct that occurred prior to May 20, 2009.

[Doc. 357 at 23].

In concluding that Holland and Moore are not entitled to relief, Judge Salinas stated:

> There is nothing on the face of the Indictment that requires dismissal of Counts Twelve or Thirteen. The Government has met the basic pleading requirements for these charges. Although the Indictment alleges a scheme dating back to 2000, the Government has also alleged that Holland and Moore executed the scheme more than four years after the § 1301 amendments went into effect when they submitted cost reports in August 2013 that contained an allegedly fraudulent misrepresentation concerning compliance with the AKS. It is for the jury to decide whether the submission of the two 2011 Cost Reports amounted to two executions of a scheme to defraud the United States. At the appropriate time, the jury will be instructed as to the controlling law on the issue. At this juncture, however, I see no basis to dismiss Counts Twelve and Thirteen on ex post facto grounds.

AO 72A
(Rev.8/82)

[Id. at 24].

In their objections, Holland and Moore complain that the Government has charged them with a crime that was not punishable by statute when it occurred. However, the operative illegal action alleged in the Indictment was the execution or submission of two cost reports that contained misrepresentations and were submitted in 2013, which was after the 2009 amendment to § 1031. The alleged misrepresentation in those cost reports was that certain services had been provided in compliance with the AKS. When the statement was made—in 2013—it was (allegedly) untrue. That is the alleged crime, at least as presented in the second superseding indictment. At this preliminary juncture the Court cannot simply determine as a general principle that just because some part of the alleged non-compliance with the AKS occurred prior to the 2009 amendments, that the 2013 statement was not also an intentional false representation. Accordingly, Judge Salinas is correct that it is up to the jury to decide whether the submission of the two cost reports amounted to two executions of a scheme to defraud the United States.

This Court does note, however, that while it has a general idea of what the cost reports are, it has not seen them, and in particular, it has not seen how those reports incorporate information from previous years. Without engaging in needless speculation, this Court can imagine that the manner in which the cost report for 2011

44

or 2013 incorporate information from, for example, 2008, could possibly raise ex post facto or other concerns in relation to the crimes alleged in the Indictment, and this Court may be willing to revisit this issue upon the presentation of evidence or information.

**5. Government's "One Purpose" Theory of Prosecution**

Defendants filed motions to "dismiss" the Government's "one purpose theory of prosecution." [Docs. 264, 270, 282]. Judge Salinas pointed out, and Defendants now agree, that the motion does not properly seek to "dismiss" anything. As Judge Salinas found,

> Rather, Defendants take issue with the legal premise, coined the "one purpose rule," that if one of the purposes of a payment to a service provider is to induce Medicaid or Medicare patient referrals, then the payment necessarily violates the AKS, even if there are other legitimate purposes for the payment. [Doc. 264 at 2-3]. Defendants contend that the facts of this case do not support a conviction based on the "one purpose rule" because here, "fair market value payments" were made "for bona fide services with perhaps the hope and expectation that referrals [would] flow from the relationship." [Id. at 4].

[Doc. 357 at 25].

In recommending that these motions be denied, Judge Salinas concluded that Defendants had disregarded the purpose of a motion to dismiss and (again) improperly sought a ruling on the evidence.

Defendants strenuously object, and this Court acknowledges that their objections are, to a limited degree, valid. The AKS prohibits payments in exchange for referrals. However, it does not prohibit every type of business relationship by and among medical service providers and the individuals or entities that refer patients. For example, a hospital may need a service, and in picking an entity to provide that service, the hospital is not prohibited from choosing to enter into a contract with an entity that also has the capacity to refer patients over one that does not. The hospital can even hope that the existing business relationship between the hospital and the entity it picks will encourage the entity to refer patients. As Defendants point out, the United States Department of Health and Human Services has promulgated safe harbor regulations that specify what payment practices are not subject to criminal or civil liability under the AKS. 42 C.F.R. § 1001.952(D), (F), (S). This Court disagrees, however, with Defendants' arguments that the one-purpose theory is at odds with medical providers ability to enter into a legitimate business relationship, the safe harbor provisions, and their First Amendment rights.

In United States v. McClatchey, 217 F.3d 823, 835 (10th Cir. 2000), the Tenth Circuit adopted the one-purpose theory after noting that every federal appellate court to consider the issue[12] had likewise adopted it. Defendants have not pointed to, and

---

[12] The cases cited by the Tenth Circuit are United States v. Davis, 132 F.3d 1092, 1094 (5th Cir.1998); United States v. Kats, 871 F.2d 105, 108 (9th Cir.1989);

this Court could not independently locate, a case in which a court has rejected the one-purpose theory. The Tenth Circuit recognized, however, that there is a difference between "a collateral hope or expectation" that the business relationship will result in referrals—which is acceptable—and referrals being a "motivating factor" behind the business relationship—which is not. Id. at 835 n.7.[13] Significant to this Court's analysis, the Tenth Circuit also approved the district court's instruction to the jury that "a hospital or individual may lawfully enter into a business relationship with a doctor and even hope for or expect referrals from that doctor, so long as the hospital is motivated to enter into the relationship for legal reasons entirely distinct from its collateral hope for referrals." Id. at 834. It is thus clear that the one-purpose theory does not have the automatic effect of criminalizing legal behavior or abrogating the safe harbor provisions.

It is further clear that this issue is best addressed in connection with this Court's instructions to the jury, and a reasonably and flexibly drafted instruction should address Defendants' concerns. Accordingly, while this Court concludes that the one-

---

United States v. Greber, 760 F.2d 68, 71–72 (3d Cir.1985). See also United States v. Borrasi, 639 F.3d 774, 782 (7th Cir. 2011). It appears that the Eleventh Circuit has not commented on the one purpose theory.

[13] Defendants contend that this is too fine a line for juries to negotiate, but this Court agrees with the Tenth Circuit that "[m]aking such difficult factual determinations . . . is the very role which our system of justice assigns to the finder of fact." Id. at 835 n.7.

purpose theory may be correct, to the degree that the Government argues the one-purpose theory to the jury, it must properly account for Defendants' ability to legally enter into a business relationship with referring individuals or entities as well as the safe harbor provisions mentioned above.

### 6. Motion to Dismiss Based on Abuse of the Grand Jury

In the Fifth R&R, Judge Salinas last considers Defendants' motions to dismiss the Indictment because of purported abuse of the grand jury. [Docs. 182, 200, 207]. These motions are another effort on the part of the Defendants to have this case dismissed based on the Government's purported bad faith, and as discussed above, this Court has not found that the Government's actions have risen to the level of bad faith.

In their motions, Defendants—Holland in particular—provide a long recitation of facts, [Doc. 365 at 3-13], which details the history of the Government's efforts in first indicting Holland in Florida, despite the facts that (1) most of the evidence and witnesses were in Georgia and all of the involved hospitals are in Georgia and South Carolina and (2) the Government atypically failed to provide for a pre-indictment meeting to allow counsel for Defendants to present factors in support of a declination of prosecution. The Government then resisted Holland's efforts to have the case transferred to this Court. When the Florida court ultimately transferred the case here, the Government obtained a stay to determine whether it would bring additional

48

charges, and instead of new charges, the Government obtained an entirely new indictment "that entirely revamped its theory of prosecution." [Id. at 12]. As discussed above, Holland and his counsel expended significant resources in challenging venue in Florida and in preparing to defend against the charges in the original indictment only to have that work rendered moot by the new indictment.

In recommending that these motions be denied, Judge Salinas first acknowledged the Government's substantial discretion in their charging decisions. See United States v. Goodwin, 457 U.S. 368, 381-82 (1982); United States v. Armstrong, 517 U.S. 456, 464 (1996). She then found that

> Defendants have failed to provide objective evidence that there was a reasonable likelihood that the prosecution team in this case was motivated by vindictiveness or a desire to punish Holland (or his co-defendants) for exercising a legal right. They have not shown that the Government has any motivation except to charge them for their alleged crimes.

[Doc. 357 at 29].[14]

---

[14] In his objections, Moore complains that Judge Salinas failed to address his arguments regarding "summary presentment," or the supposedly abusive tactic of providing summaries of the evidence to the grand jury with the testimony of government agents rather than calling the actual witnesses. However, in his motion to dismiss, [Doc. 200], Moore merely adopts Holland's motion, [Doc. 182], and neither Holland's nor Moore's motions brief the issue of "summary presentment." In a footnote, Moore contends that he had "previously detailed the prejudicial impact of the Government's calculated manipulation of the grand jury process in his Objection to the Third Report and Recommendation [Doc. 354] and therefore does not restate those arguments here . . . ." At the outset, citing to the entirety of a twenty-seven page document is unacceptable. Moreover, this Court has again reviewed those objections and again found no discussion of substance regarding "summary presentment" other

49

Although the Court reiterates the concerns and findings regarding the Government's tactics in proceeding with the indictment in the Southern District of Florida, the Court agrees with Judge Salinas that Defendants have failed to demonstrate that the Indictment should be dismissed based on the Government's abuse of the grand jury process. The Court does not view the evidence to be sufficient to meet the high bar for demonstrating the Government's intentional use of abusive tactics or prosecutorial vindictiveness based on the defendants' exercise of their legal rights.  See United States v. Goodwin, 457 U.S. 368, 372 (1982).  Having reviewed the record in light of Defendants' objections, this Court holds that Judge Salinas' findings and conclusions in the Fifth R&R are correct, subject to the Court's earlier observations.

---

than the brief discussion of the use of the summaries in place of live testimony in footnote 6 of the objections. [Doc. 354 at 12] In any event, the sparse case law  that discusses the issue of presenting summaries of the evidence to the grand jury by government agents indicates that the practice is acceptable.  See United States v. Casamento, 887 F.2d 1141, 1182 (2d Cir. 1989). The Court recognizes that Defendant Moore's Objections also present an interesting theory that the Government had orchestrated a "divide and conquer scheme" to separate the defendants and proceed against Holland first in Florida in a lead test case—and thereby gain a tactical advantage and cause further delay in the proceedings involving Moore in Atlanta.  But this "divide and conquer" theory was not presented squarely in Moore's original motion [Doc. 200] directly or via his adoption of Holland's Motion and is ultimately speculative.

### III. Motions in Limine Related to Evidence of Risk of Patient Harm

**A. Background**

Paragraphs 55 and 56 of the Indictment state:

> 55. Some Clinica patients, as a result of defendants' intended conduct, traveled long distances from their respective homes to deliver at a Tenet Hospital and bypassed other hospitals to do so, all of which at the very least created a reckless risk of serious personal and bodily injury to the Clinica patients and their respective babies.

> 56. Some Clinica patients, as a result of defendants' intended conduct, also received problematic and disparate care related to childbirth at the Tenet Hospitals, which also created at the very least a reckless risk of serious personal and bodily injury to the Clinica patients and their respective babies.

[Doc. 121 ¶ 56 at 21-22].

Essentially, the Government wants to present evidence that Defendants, by engaging in their alleged scheme to improperly refer pregnant Clinica patients to Tenet hospitals, exposed those patients to an increased risk of harm. Defendants move to prohibit the Government from making references to, and presenting evidence about, the allegations in Paragraphs 55 and 56. [Docs. 374, 376, 377, 426, 429].

Defendants argue that this evidence is irrelevant to the question of whether they engaged in paying and receiving illegal referral payments or in defrauding the United States. They further contend that the very few patients that the Government has identified as having received inadequate care are statistically irrelevant and their

testimony would confuse and inflame the passions of the jury. As a result, they argue, this evidence should be excluded because the questionable probative nature of the evidence is significantly outweighed by the unfair prejudice that its introduction would cause.

The Government summarizes its arguments as follows:

Evidence that Defendants' intended conduct exposed Clinica mothers to a risk of harm is relevant evidence for several reasons. First, it proves Defendants' wrongful intent. Such evidence proves that Defendants wrongfully traded Clinica mothers for money, regardless of patient choice and the best interests of patients. Second, it provides essential context to the charges and completes the story of the offenses. Defendants funneled Clinica mothers to Tenet Hospitals for one purpose: to increase payments from Medicaid and Medicare. Third, it must be considered by the jury to determine any sentencing enhancement as to Counts Twelve and Thirteen (Major Fraud) . . . . Fourth, it is relevant once Defendants, as they have throughout the pre-trial litigation, opened the door by injecting into trial the quality of care and services provided to Clinica mothers at Tenet Hospitals. The probative value of this evidence is therefore significant and not substantially outweighed by Defendants' cited concerns.

[Doc. 382 at 4].

At an October 19, 2017, hearing, this Court voiced its concerns regarding patient harm evidence. [Doc. 174 at 37-39]. Those concerns remain. As discussed at the hearing, this case is ultimately about money—whether Defendants disguised sham contract payments for the referral of patients. Adding a medical malpractice element to the case does not directly aid in answering that question and is likely to turn a significant portion of the trial into a debate over a tangential issue that would

significantly lengthen the trial and pose a serious potential risk of causing juror confusion and prejudice.

**B. Legal Standard**

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Fed. R. Evid. 401.

"Irrelevant evidence is not admissible." Fed. R. Evid. 402.

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403.

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged[, such as] an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Old Chief v. United States, 519 U.S. 172, 180 (1997) (quotations and citations omitted). However, exclusion of evidence under "Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be

struck in favor of admissibility." <u>United States v. Edouard</u>, 485 F.3d 1324, 1344 n.8

(11th Cir. 2007) (quotations and citations omitted).

## C. Discussion

### 1. Is the Evidence Relevant?

Defendants and the Government differ sharply on whether risk of patient harm

evidence is relevant. Defendants argue that evidence of patient harm has no bearing

on the central question of whether Defendants intended to disguise contract payments

for the referral of patients. As detailed above, the Government contends that the

evidence is relevant because (1) it shows intent in that Defendants put their pecuniary

interests above the well-being of patients, (2) it "completes the story" of the offenses,

(3) it is necessary to determine a sentencing enhancement as to Counts Twelve and

Thirteen, and (4) Defendants will "open the door" by contending that the patients

received quality care.

With respect to the Government's first argument, both Judge Salinas and the

Government have cited to <u>United States v. Kallen-Zury</u>, 629 F. Appx. 894, 905 (11th

Cir. 2015), for the proposition that the Eleventh Circuit has stated that evidence of

harm to patients can be relevant as circumstantial evidence of fraudulent intent in a

Medicare fraud case to show "that the defendants valued Medicare payments over the

health and comfort of their patients." To be precise, the Eleventh Circuit merely noted

AO 72A
(Rev.8/82)

that the district court had admitted the evidence for that purpose without commenting

on the propriety of doing so, and the issue before the court was not the admissibility

of the evidence but the propriety of the arguments that the Government made about

that evidence. This Court further points out that the facts of <u>Kallen-Zury</u> are

qualitatively different. In that case, the Defendants, who owned or worked at a Florida

mental health facility, Hollywood Pavilion or HP, paid recruiters to bring them

patients.

> These recruiters would find patients from as far away as Maryland. They
> would pay to have the patients ride buses down to HP in Hollywood,
> Florida. Most of the patients were drug addicts who did not need the
> psychiatric services offered at HP. Accordingly, the conspirators would
> often falsify the patients' records to reflect serious psychiatric problems.

> Additionally, HP would only admit patients who had enough days on
> their Medicare plans to have their treatment periods paid for by the
> government. When the Medicare money ran out, the patients would be
> dismissed. Through this scheme, HP filed tens of millions of dollars in
> fraudulent claims to Medicare. Some of the recruiters also ran halfway
> houses and made extra money when HP referred discharged patients to
> those facilities.

<u>Id.</u> at 897. There was also evidence in <u>Kallen-Zury</u> that conditions at the halfway

houses were substandard. <u>Id.</u> at 905.

It is clear that the <u>Kallen-Zury</u> defendants actively participated in the

mistreatment of patients by falsifying patient records to reflect that they suffered from

mental health maladies and then sent them packing as soon as their Medicare payments

55

ended.  In this case, the connection between Defendants' actions and risk to patients is much more tenuous because Defendants were not directly involved in patient care. Kallen-Zury is also distinguishable because of the vast number of patients at issue in this case and the apparently statistically insignificant number of bad patient outcomes in a birthing context where some adverse outcomes do at times occur.  See *infra* discussion at § III.C.2.

The Government has also cited to an order in United States v. Esformes, 16-20549-CR (March 15, 2019, S.D. Fla.) (filed as Exhibit A to [Doc. 441]), in which the court denied the defendants' motion to exclude evidence about the quality of care. That order, however, is summary in nature and provides no discussion of the facts of the case or the court's reasoning for denying the motion.  Moreover, having reviewed the Government's response in opposition to Esformes' motion in limine to exclude evidence of quality of care, id. Motion at CM/ECF Doc 1096 (Feb. 8, 2019), it appears that  patient care evidence is clearly relevant in that case because Esformes is accused of billing Medicare for services that were not rendered and the Government seeks to present patient testimony that the patients did not actually receive the services for which Esformes billed Medicare.  Id. at 3 ("Evidence that people were deprived of basic necessities that the Defendant asked Medicare to pay for, such as food and diapers, is therefore part of this alleged fraud scheme."); at 4 ("To determine if the

AO 72A
(Rev.8/82)

claims to Medicare were false and fraudulent, the jury must be able to compare what services were billed for and what services were actually provided."). Here, there is no suggestion that Government's "patient harm" evidence is associated with proof of an allegation that Defendants billed for services that were not provided.

Having distinguished the two cases cited by the Government, however, this Court recognizes that evidence of risk to patients in this case *may* potentially tend to indicate intent. Holland and Moore stand accused of violating the law by paying kickbacks to bring more patients to their hospitals, and Cota stands accused of accepting those kickbacks to refer the patients. In their role as healthcare executives, Defendants would be expected to put patient welfare above their financial interests, and the fact that they did not do so may indicate that they favored financial gains from the fraud scheme over the interests of their patients. Still, in the context of the allegations in the current case, the relevance of this evidence, to the degree that it exists at all, is slight. Hospital executives can (and probably sometimes do) accept legal patient referrals and related business strategies to increase revenue at their hospitals while at the same time knowing that those patients might potentially be better served at a different hospital because the care might be in some way better at the different hospital. While those executives' actions may be unethical, they are not illegal, and

AO 72A
(Rev.8/82)

their actions in that regard are not per se evidence of their having committed a crime.

In the discussion below regarding the fine enhancement under the major fraud statute, 18 U.S.C. § 1031, this Court notes that there does not seem to be a causal connection between the alleged fraud and the risk of harm to patients. That concern also applies to this discussion: if all patients faced the same risks of harm regardless of whether they were illegally referred, the existence of those risks likely does not demonstrate intent to violate the AKS.

The Government's argument that the evidence "completes the story" of Defendants' crimes is still less convincing. "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime to complete the story of the crime for the jury." United States v. Wright, 392 F.3d 1269, 1276 (11th Cir. 2004) (alterations, quotations and citations omitted). In Wright, a police officer, Knox, attempted to arrest Wright for driving under the influence, and Wright resisted and assaulted Knox in the process. Id. at 1271. Upon searching the vehicle after Wright's arrest, Knox discovered a handgun. Id. Because Wright was a convicted felon, he was tried in federal court for being a felon in possession of a firearm, and the Eleventh Circuit concluded that the

district court properly admitted evidence of the DUI, resisting arrest, and assaulting the officer.

> Here, the possession of a firearm charge did not encompass the resisting arrest or battery counts, nor did it involve the charge of driving under the influence. Nonetheless, evidence of those events contributed to the understanding of the situation as whole. The erratic driving led Officer Knox to stop Wright. Knox's assessment of Wright's intoxication gave him to cause to arrest Wright. The series of events culminated in Wright's violent struggle with Knox, and ultimately the discovery of the firearm. If the jury had merely heard evidence of the last event—the discovery of the firearm—the jury would be relegated to its own, and possibly incorrect, assumptions about the events prior to officers finding the weapon. The probative value of this evidence is demonstrated by the need to put a cohesive sequence of the crime before the jury. Likewise, evidence of resisting arrest is probative of Wright's consciousness of guilt. United States v. Borders, 693 F.2d 1318, 1324 (11th Cir. 1982). This Court has held that "evidence of resistance to arrest and flight is admissible to demonstrate consciousness of guilt and thereby guilt." United States v. DeParias, 805 F.2d 1447, 1454 (11th Cir. 1986) (overruled on other grounds). Therefore, we find that the evidence of Wright's resistance to arrest and the accompanying battery on a law enforcement officer is relevant to proving the charged offense.

Id. at 1276-77.

Similarly, in United States v. Fuertes, 723 Fed. Appx. 733 (11th Cir. 2018), Gladys and Mario Fuertes were convicted of healthcare fraud, conspiracy to commit healthcare fraud, and obstructing a healthcare crime investigation. In their appeal, the Fuertes challenged evidence admitted in their trial that illegally-recruited patients to the Fuertes' clinics were "paid" with Oxycodone prescriptions (the recruiter would later purchase the Oxycodone pills for resale). The Eleventh Circuit affirmed,

59

concluding that "[w]hile it is true that the Fuerteses were not charged with drug trafficking crimes, the Oxycodone prescription scheme was a part of the overall conspiracy. . . . It was, in other words, 'inextricably intertwined' with the charged conduct and 'necessary to complete the story' of explaining [the recruiter's] and some patients' involvement." Id. at 737.

The Government's argument that risk to patients evidence "completes the story" of Defendants' crimes are barely more than conclusory assertions, limited to the contention that "[t]he story of Defendants' crime is not just a contract dispute. Labor and delivery, as Defendants recognize, is a 'high risk' medical event. Defendants' conduct compounded these risks, all to make money." [Doc. 382 at 14]. This Court does not agree that there is sufficient linkage between the crimes accused and a risk of harm to patients. The criminal charges in the Indictment are proven if the Government establishes that Holland and Moore paid, and Cota accepted, kickbacks for patient referrals. Evidence of risk of harm to patients is entirely tangential. Such evidence would not provide needed context, was not a part of the conspiracy, and would not help the jury understand the Defendants' alleged crimes.

The Government is on only slightly firmer ground in arguing that risk of patient harm evidence is necessary to determine a sentencing enhancement for Counts Twelve and Thirteen. Those counts allege major fraud in violation of 18 U.S.C. § 1031. The

60

statutory maximum fine under § 1031(a)(2) is $1,000,000. However, the statutory maximum may be increased "not to exceed $5,000,000" where "the offense involves a conscious or reckless risk of serious personal injury." 18 U.S.C. § 1031(b)(2). The Indictment charges this sentencing enhancement, and after Apprendi v. New Jersey, 530 U.S. 466 (2000) (holding that other than fact of prior conviction, any fact that increases penalty for crime beyond prescribed statutory maximum must be submitted to jury and proved beyond reasonable doubt), it superficially appears that evidence of risk of harm to patients would be relevant for that purpose.

However, based on a review of the record, it further appears that the Government's § 1031(b)(2) evidence suffers from a significant disconnect. As pointed out by Moore in his reply memorandum, [Doc. 385 at 5], the Indictment alleges that the Clinica mothers received "problematic and disparate care," but nothing in the Government's evidence indicates that the care was disparate—that, for example, unsupervised residents delivered babies of only improperly referred Clinica mothers. Undoubtedly, other expectant mothers who were not part of the kickback scheme delivered their babies at the subject Tenet hospitals, and indications are that they were subject to the same risks as the Clinica mothers.[15]

---

[15] The Court observes additionally that parents frequently choose hospitals for delivery that are not the closest to their homes, based on a variety of personal or physician preferences or alternatively, concerns regarding the hospital options closest to home, or other considerations.

This Court could not find a single case that discussed how the "conscious or reckless risk of serious personal injury" element of § 1031(b)(2) is to be applied,[16] but the language of the statute says that the enhanced fine applies when "the offense *involves* a conscious or reckless risk of serious personal injury" (emphasis added). A plain reading of the statute, in particular the requirement that the offense involved a conscious or reckless risk, indicates that in order for the enhanced fine to apply, the Government would have to establish a causal connection between the acts constituting the major fraud and the risk. C.f., United States v. Flores-Flores, 356 F.3d 861, 862 (8th Cir. 2004) (requiring a causal connection between death and dangerous condition created by defendant under U.S.S.G. § 2L1.1(b)(5)). For example, a contractor might defraud the Government by using shoddy building materials that render a building unsafe. There, the risk of bodily injury from the unsafe building is unquestionably a result of the fraud—without the fraud, there would be no risk. Here, Cota/Clinica could have referred its patients to Holland/Moore/Tenet without any financial incentives, the referrals would have been legal, and it appears that the patients would have faced the same risks. This Court thus concludes that evidence of risks to patients is not admissible for the Government to establish an enhanced fine under § 1031(b)(2) unless the Government can establish with competent evidence that the Clinica mothers

---

[16] Perhaps the parties can point to such cases, but to date, they have not.

received care that was meaningfully disparate from that received by other Tenet obstetric/neonatal patients and that the disparate care occurred as a result of the fraud.

Finally, this Court is not convinced by the Government's argument that Defendants will "open the door" to risk of harm evidence.[17] If the evidence were otherwise inadmissible, and Defendants presented evidence of the quality of care that the patients received, this Court would permit the Government to present evidence to show the contrary. As such, this Court is confident that Defendants will not be the ones to open that door at trial.[18]

### 2. Does the Prejudicial Effect Outweigh the Probative Value?

Having determined that risk of patient harm evidence is, at best, only marginally relevant to demonstrate intent in this specific case, this Court will consider whether the evidence is inadmissible under Fed. R. Evid. 403. Though not expressly stated in the various parties' pleadings, the evidence that the Government seeks to present can be classified into two types. The first type is evidence of bad outcomes suffered by individual Clinica patients that were referred to Tenet hospitals. The second type is

---

[17] This Court agrees with Defendants' assessment, [see, e.g., Doc. 385 at 8], that it was the Government that first brought up quality of patient care by including it in the Indictment, and that whatever statements counsel for Defendants made in response to those allegations did not have the effect of "injecting" issues of patient care.

[18] On the other hand, all parties can present evidence regarding how the referral and care of patients was administratively handled and coordinated.

evidence of irregularities in the provision of obstetric care at Tenet Hospitals. Examples of this second type of evidence are the Government's allegations that medical residents delivered babies of Clinica mothers with no physician supervision, that interpreters who worked in a labor-and-delivery ward were not qualified, and that a Clinica physician regularly delivered over 100 babies per month. [See Doc. 382 at 5-8].

With respect to the first type—evidence of bad patient outcomes—this Court concludes that the evidence is not admissible for any purpose. Based on Defendants' pleadings, it is not clear exactly how many patients the Government intends to present evidence on, but it appears to be no more than twenty and may be fewer.[19] Over the course of the alleged conspiracy, it appears that Cota referred approximately 20,000 patients to Holland's and Moore's hospitals, so that the Government intends to demonstrate bad outcomes using a sample size of no more than 0.1% of the patients, which is statistically irrelevant. This Court takes judicial notice of the fact that United States Department of Health and Human Services Agency for Healthcare Research and Quality reports that in 2015, 1.47% of women giving birth in the United States suffered from "severe complications." Available at https://www.ahrq.gov/news/

---

[19] The Government has not disputed any of the Defendants' accounts of the number of women involved.

newsroom/press-releases/complications-hospital-births.html. It is thus obvious that within any randomly selected population of 20,000 births, it would be comparatively easy to identify twenty bad outcomes, rendering the Government's proposed evidence meaningless.

This Court further concludes that bad patient outcome evidence would be unfairly prejudicial to Defendants. Judge Salinas entered an order granting Defendants' motions to exclude the Government's medical expert, [Doc. 433], and, below, this Court concludes that the Government's appeal of that order is moot. However, if that expert were to testify, as Defendants point out, the expert did not review any patient medical records and thus cannot opine on what might have caused the purported bad outcomes. We are thus left with the prospect of individual women providing lay-witness narratives of the physical and psychic pain and suffering that they endured with no valid (i.e., scientific) basis to connect that pain and suffering to anything that Defendants did or failed to do. The potential of this evidence to inflame and confuse the jury is great, and as already noted, the probative value of the evidence is quite limited.

Moreover, Defendants will seek to counter this evidence, possibly by presenting evidence of good outcomes and possibly with expert testimony. In either event, the prospect of twenty or sixteen or six Government witnesses followed by an equal or

greater number of defense witnesses testifying on an issue of dubious relevance would be an obvious waste of time. Accordingly, this Court concludes that bad patient outcome evidence is inadmissible under Fed. R. Evid. 403.

While the second type of evidence, the irregularities at the subject Tenet hospitals, is less problematic, this Court nonetheless concludes that the unfair prejudice of that evidence outweighs its probative value based on this Court's assessment of that evidence, as described by the parties. Similar to the discussion above, if the irregularities affected all obstetric patients and not just the Clinica mothers, this Court does not see how that evidence would tend to demonstrate an intent to commit fraud or violate the AKS. However, if the Government is able to demonstrate with competent evidence that the irregularities affected only illegally-referred patients, this Court will revisit the issue.

To summarize, this Court concludes that evidence of risk of harm to patients is inadmissible. This conclusion renders moot the Government's appeal, [Doc. 437], of the Magistrate Judge's order excluding the testimony of the Government's proposed obstetrics expert Jean Bolan, M.D., [Doc. 433].[20] To the degree that the Government can establish that evidence of a risk of harm to patients relates to Defendants' alleged

---

[20] The Court additionally notes that there was a sound basis for the Magistrate Judge's Order.

crimes as discussed above, this Court will revisit the Government's appeal upon a motion by the Government.

## IV. James Hearing

This Court has reviewed the parties arguments in connection with Defendants' motions seeking a hearing pursuant to <u>United States v. James</u>, 590 F.2d 575 (5th Cir. 1979). [Docs. 195, 218, 223]. Defendants request that the government be required to prove—as a prerequisite to the introduction of co-conspirator hearsay statements at trial—that those statements are admissible under Fed. R. Evid. 801(d)(2)(E), which provides that statements of co-conspirators made during the course and in furtherance of the conspiracy are not hearsay. For the statements to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence that: (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant(s) against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy. <u>United States v. Miles</u>, 290 F.3d 1341, 1351 (11th Cir. 2002).

The Government opposes the motion, pointing to the significant body of case law in the Eleventh Circuit that holds that a <u>James</u> hearing is not required if such a hearing would be impractical. Instead, this Court "could admit the statements subject to the government's 'connecting them up' with enough independent evidence by the

AO 72A
(Rev.8/82)

end of trial." <u>United States v. Roe</u>, 670 F.2d 956, 962 (11th Cir. 1982); <u>see also</u> <u>United States v. Hasner</u>, 340 F.3d 1261, 1274-75 (11th Cir. 2003); <u>United States v. Hewes</u>, 729 F.2d 1302, 1312(11th Cir. 1984).

The problem in this Court's opinion is that according to Defendants, and undisputed by the Government, there are as many as fifty-five potential coconspirators involved in this case. On the one hand, this Court shares the Government's concern that a <u>James</u> hearing has the potential to turn into a several-day mini-trial. On the other, this Court strongly wishes to avoid a situation at trial where the parties haggle at length over the admissibility of numerous coconspirator statements while the jurors sit in the jury room clogging their arteries with stale muffins and losing their attention and capacity to absorb the evidence.

This Court proposes a compromise. Because it plans to do it anyway (albeit thirty days before the as-yet unscheduled trial) the Government should provide to Defendants, within sixty days, its list of coconspirator statements that it intends to introduce at trial along with its arguments in support of the contention that the conspiracy included the declarants and the defendant(s) against whom the statements are offered and that the statements were made during the course and in furtherance of that conspiracy. Defendants can then file a motion at least sixty days before the trial seeking exclusion of whatever statements that they believe (in good faith) should be

AO 72A
(Rev.8/82)

excluded. This Court will review that motion and either rule on the admissibility of the statements or, where necessary, hold a hearing.

## V. Conclusion

*Based on the foregoing discussion, and as limited and/or modified by the Court's discussion herein, it is hereby* **ORDERED** *that:*

The First R&R, [Doc. 306], is hereby **ADOPTED** as the order of this Court, and Defendants' motions to dismiss, [Docs. 183, 186, 187, 201, 209, 214, 217], are **DENIED**.

The Second R&R, [Doc. 332], is hereby **ADOPTED** as the order of this Court, and Defendants' motions to sever, [Docs. 262, 263], are **DENIED**.

The Third R&R, [Doc. 339], is hereby **ADOPTED** as the order of this Court, and Defendants' motions to dismiss for delay and due process violations [Docs. 177, 180, 181, 199, 205, 261], are **DENIED**.

The Fourth R&R, [Doc. 348], is hereby **ADOPTED** as the order of this Court, and Holland's motion, [Doc. 188], is **GRANTED IN PART** and Count Ten of the Indictment, charging Defendant John Holland with falsification of books and records, shall be **DISMISSED** without prejudice for lack of venue within 14 days of the date of this Order.[21]

---

[21] The Court provides this 14 day window solely to give Defendant Holland an opportunity, if he so chooses, to consent to venue in connection with Count Ten.

AO 72A
(Rev.8/82)

The Fifth R&R, [Doc. 357], is hereby **ADOPTED** as the order of this Court, and Defendants' motions to compel [Docs. 185, 204, 213], motions to dismiss for failure to allege fraud, [Docs. 184, 202, 211], motions to dismiss counts for defective allegations, [Docs. 189, 206], motion to dismiss for ex post facto violations, [Docs. 190, 208], motions to dismiss the Government's "One Purpose" Theory, [Docs. 264, 270, 282], motions to dismiss based on abuse of the grand jury, [Docs. 182, 200, 207], are **DENIED**.

Defendants' motions in limine to exclude evidence of risk of harm to patients, [Docs. 374, 376, 377, 426, 429], are **GRANTED** and such evidence is excluded.

The Government's Objections to the Magistrate Judge's Order Granting Defendants' Motions to Exclude or Limit the Expert Testimony of Dr. Jean C. Boland, M.D. (Docs. 433, 437) are **DENIED**.

Defendants' motions for a <u>James</u> hearing, [Docs. 195, 218, 223], are **GRANTED IN PART**. The Government is **ORDERED** to provide to Defendants, within sixty days, its list of coconspirator statements that it intends to introduce at trial along with its arguments in support of the contention that the conspiracy included the declarants and the defendant(s) against whom the statements are offered and that the statements were made during the course and in furtherance of that conspiracy. Should

70

they seek to do so, Defendants **MUST FILE** their motion seeking exclusion coconspirator statements at least sixty days before the trial.

In addition, Holland's various motions to file excess pages, [Doc. 355, 364, 380], are **GRANTED** nunc pro tunc.

**IT IS SO ORDERED,** this 21st day of June, 2019.

_____
**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**

71